**Donald Burton BAKER, et al., Plaintiffs,**

v.

**BRIDGESTONE/FIRESTONE, INC., et al., Defendants.**

No. 5:91 CV 1988.

United States District Court, N.D. Ohio, Eastern Division.

July 25, 1995.

David A. Looney, Blakemore, Meeker & Varian, Akron, OH, John L. Hash, Winston–Salem, NC, J. Roland Wagner, Eric R. Wagner, Law Offices of J. Roland Wagner, Napa, CA, W. Carl Reynolds, Katherine L. McArthur, Bradley J. Survant, Reynolds & McArthur, Macon, GA, Steve R. Warren, Reynolds & McArthur, Asheville, NC, Thomas W. Bennett, Macon, GA, for Donald Burton Baker, Sr., Betty Muriel Baker.

Harland B. Horton, Jr., Bridgestone/Firestone, Inc., Dept. of Law, Akron, OH, Paul M. Pohl, Joseph M. David, John D. Goetz, Jones, Day, Reavis & Pogue, Pittsburgh, PA, Robert J. Drexler, Sr., Knowlton, Sanderson, Ragan, Cady, Corbett & Drexler, Akron, OH, Thomas F. Gardner, Jones, Day, Reavis & Pogue, Chicago, IL, Frances E. Prell, Julie P. Shelton, Burke, Weaver & Prell, Chicago, IL, Richard M. Markus, Porter, Wright, Morris & Arthur, Cleveland, OH, for Bridgestone/Firestone, Inc.

Edward J. Cass, Timothy John Fitzgerald, Gallagher, Sharp, Fulton & Norman, Cleveland, OH, for Kelsey–Hayes Co.

Robert Franklin Orth, Roderick, Myers & Linton, Akron, OH, Thomas P. Schult, Stinson, Mag & Fizzell, Kansas City, MO, for The Budd Co.

Charles E. Pierson, David P. Bertsch, Buckingham, Doolittle & Burroughs, Akron, OH, for Goodyear Tire & Rubber Co. Inc., Motor Wheel Corp.

## MEMORANDUM & ORDER

SAM H. BELL, District Judge.

On October 6, 1990, Plaintiff Donald Burton Baker was seriously injured by an exploding wheel rim alleged to have been made by one of the defendants. Plaintiffs filed this product liability action in 1991. The case proceeded in a normal fashion through case management, and the trial was originally scheduled to commence on July 14, 1992. Due to protracted discovery, the trial date was eventually moved to January 12, 1994. On December 3, 1993, Defendant Bridgestone/Firestone, Inc.[1] moved the Court to disqualify John Hash, an attorney for the plaintiffs, arguing that Hash had improperly learned Firestone's confidences from a former Firestone attorney, Joseph Downs. Because of the potential impact of Firestone's motion on this case and at least two others, the Court elected to continue the trial date and to conduct an evidentiary hearing. After holding the hearing, this Court denied the motion.

Firestone filed a similar motion in a second case pending in the District of Kansas, *Kelling v. Bridgestone/Firestone, Inc.*, No. 93–1319–FGT. Hash served as lead counsel for the plaintiff in *Kelling*. Discovery conducted in *Kelling* provided Firestone additional evidence casting doubt on the propriety of Hash's involvement in *Kelling* and in this case. In an order filed on October 17, 1994, 1994 WL 723958, the Honorable Frank G. Theis, United States District Judge for the District of Kansas, disqualified Hash in *Kelling*.

Resolute on this issue, and armed with the evidence unearthed in *Kelling,* Firestone renewed its motion for disqualification in this Court and eventually expanded the motion to reach all of Plaintiffs' attorneys. The Court conducted a two-day evidentiary hearing on the renewed motion in March of this year. The Court has since received and reviewed

1. Throughout this opinion, the Court refers to Defendant Bridgestone/Firestone Company and to its predecessor, The Firestone Tire & Rubber Company, by the single appellation, "Firestone."

the parties' post-hearing briefs. Its findings of fact and conclusions of law are incorporated below.

## I

Attorney Joseph Edward Downs lives and practices law in Stokes County, North Carolina. Prior to moving to North Carolina, Mr. Downs resided in Akron, Ohio, where he served for eighteen years as a staff attorney for Firestone.

Downs has been fairly described as Firestone's former "chief multi-piece rim counsel." He devoted much of his time with Firestone to the defense of multi-piece rim product liability claims brought against the company. Downs was largely responsible for the development of Firestone's standard defense, and he worked closely with the various attorneys, witnesses and defense experts typically involved in Firestone's multi-piece rim cases.

In 1986, Downs left Firestone to accept a position with the R.J. Reynolds Tobacco Company ("RJR") in Winston–Salem, North Carolina. He departed from RJR in September of 1988, remaining in North Carolina and practicing privately.

An avid pilot, Downs met Attorney John Lawler Hash, also a private pilot, at a North Carolina airfield in the fall of 1987. Hash had recently quit his practice in Huntington, West Virginia and was practicing law from his new home in Clemmons, North Carolina. Downs' and Hash's shared interest in flying led to a mutual friendship.

In August of 1986, while still in West Virginia, Hash had been visited by Anna Workman. Mrs. Workman's husband and son had both been injured—the former fatally—by an exploding multi-piece truck rim manufactured by Firestone. Despite the fact that Hash had no experience in multi-piece rim litigation, the Workmans retained him to pursue their claims against Firestone and others. Although he had not yet filed suit on their behalf, Hash continued to represent the Workmans after relocating to North Carolina in the fall of 1987.

Upon meeting Downs, Hash quickly recognized him as the author of numerous Firestone documents Hash had seen while researching multi-piece rim litigation for the Workmans. Hash mentioned his clients to Downs, and the two men agreed that it would be inappropriate to discuss the case given Downs' former position at Firestone.

Notwithstanding their agreement, Downs became enmeshed in Hash's prosecution of the Workman case. Hash filed *Workman v. General Motors Corp., et al.*, No. 88–2780A, with this Court on July 28, 1988. Hash had invited Downs to review the complaint before it was filed, and Downs had done so, expressing his approval.

There is no direct evidence to suggest that Downs schooled Hash in the technical niceties of Firestone's wheel products, either as to their design or production. Indeed, the testimony suggests that Hash remained woefully ignorant in this regard. As a longtime player in the ongoing drama of rim litigation, Downs offered Hash an insider's impressions of the strengths and weaknesses of at least some members of the largely familiar cast of characters.

As an example, Downs and Hash discussed the abilities of Robert Lee, a Firestone employee and frequent witness for Firestone in rim cases. Lee was scheduled to appear as a defense witness in *Workman,* and Hash has since subpoenaed him to testify in this matter. In several exchanges with Hash, Downs described Lee as a seasoned witness and cautioned Hash to be well-prepared for Lee's deposition and trial examination. Similarly, Downs expressed his general regard for one Wolfgang Knauss, another expert frequently called by Firestone in cases such as this. Hash has since deposed Knauss in preparation for the trial of this case.

Hash also solicited Downs' opinion concerning Max Nonnamaker, a Firestone employee who, having left the company, testified as an expert witness in various multi-piece rim cases. Downs informed Hash that Nonnamaker was a respected expert in the field. Hash named Nonnamaker as an expert witness in the *Workman* case and, later, in this case. On another occasion, Downs mentioned that he knew Paul Youngdahl, a former University of Michigan professor who

had testified on the plaintiff's behalf in other rim cases. Youngdahl is scheduled to testify for the Bakers in this case.

Additionally, Downs told Hash that former Firestone engineer Steven Blate had been used by Firestone as a "gofer," suggesting Blate had been mistreated and might bear some ill will toward Firestone. Consequently, Hash deposed Blate and served him with a trial subpoena in this case.

On at least one occasion, Downs went so far as to assist Hash in procuring and developing a potential expert witness. Michael Maddox, Ph.D., works as a human factors consultant in Madison, North Carolina. Maddox met Downs for the first time in 1990 when Downs invited Maddox to his office to discuss an automobile injury case. The two discussed the case, which concerned a faulty braking system, but Maddox did not become involved as an expert in that instance. Several months later, Maddox received a telephone call from Hash, who sought to arrange a meeting with Maddox to discuss the *Workman* case. Eventually, Hash retained Maddox to serve as an expert witness in the case even though Maddox had never previously been involved with a multi-piece rim case. At some point, Maddox met with Hash and Downs to prepare for his anticipated participation in the *Workman* trial. In Maddox's estimation, the meeting continued for about one hour; Hash testified that it lasted only ten minutes. In any event, Hash concedes that Downs offered Maddox general advice on how to conduct himself while on the stand. Maddox billed his time for this meeting to the Workmans. Since that time, Maddox has been identified and deposed as an expert witness in this matter.

After leaving RJR, Downs leased a new office suite in the small town of King, North Carolina. He invited Hash to rent a single room within the Main Street office. Hash accepted the offer and practiced out of the same suite as did Downs from October of 1989 to October of 1990. Although Hash altered the letterhead on most of his stationery to reflect his new business address, he continued to use a Winston–Salem post office box as his mailing address in the *Workman* case. He never mentioned his friendship with Downs to any members of the Firestone litigation team in *Workman*, even though he knew personally that Downs had worked with a number of these people in years past. These facts lead this Court to conclude, as did Judge Theis, that Hash actively sought to conceal his relationship with Downs from Firestone.

Late in 1990, as the trial of *Workman* drew near, Hash arranged to have Kenneth Williford, a personal injury lawyer from Texas, enter the case as co-counsel for the plaintiffs. Williford had considerable experience trying multi-piece rim cases against Firestone, and, through the course of his representation, he had come to know Downs personally. At no time, however, did Hash mention to Williford his acquaintance with Downs. Hash's and Williford's relationship deteriorated rapidly as the Texan became increasingly skeptical of Hash's ability. In his own words, "It became very apparent that [Hash] did not even know how to begin to handle a products case, had little or no retained knowledge concerning these wheels and what had gone on with them." Finally, the two attorneys reached an impasse on a proper settlement figure. Feeling Hash had undermined his efforts to settle the case, Williford withdrew as plaintiffs' counsel.

Williford's description of Hash's incompetence raises serious questions about Hash's actual role in prosecuting *Workman* and subsequent rim cases. Evidence offered by Firestone strongly suggests that Downs did more than simply loan his support to Hash; Downs appears to have assumed the dominant role in planning and shaping the litigation. The testimony of Dr. Aristar–Dry leads one to the conclusion that Downs himself drafted many of the pleadings in *Workman*. And support for this conclusion is found in the telephone records produced by Firestone. Those records show that Hash, while in Akron for a status conference before this Court on November 15, 1990, sent a twenty-one page facsimile to Downs' office in North Carolina. (Hash had by this point moved to a separate office.) During that same conference, the Court ordered the plaintiffs to respond to a twenty-one page summary judgment motion that had been

filed by General Motors. It is clearly reasonable to conclude that Hash faxed General Motors' motion to Downs to enable Downs to begin a response brief. Procured telephone records reveal different calls made by Hash to Downs during periods of time in which Hash was outside North Carolina conducting discovery in *Workman.* Finally, similar records show that Downs telephoned Steve Blate several times immediately before Hash subpoenaed Blate to testify in this case.

In the fall of 1991, Hash settled the *Workman* case with Firestone for $1,200,000.00. Hash received the settlement checks on November 2, 1991 and retained $469,418.00 as his fee. Two days later, Hash wrote a personal check for $234,709.33 payable to Joseph Downs' legal professional corporation. When testifying in Kansas, and again before this Court, Hash explained this check to Downs as repayment for two separate personal loans, one for twenty-five thousand dollars, the other for roughly eighteen thousand dollars. According to Hash, Downs made the loans on the condition that Hash repay the money with interest or, at Downs' option, give Downs one-half of Hash's fee in *Workman.*

The Court is not convinced that Downs actually did provide Hash any cash in return for the one-half interest in the *Workman* fee. Hash can point to no paper trail reflecting the exchange: no cancelled checks, no bank deposits. He has no promissory note documenting the first loan and one of dubious origin allegedly documenting the second.[2] Hash testified that Downs provided the money in cash, which Hash in turn placed in a safe-deposit box at Central Carolina Bank. But records from the bank indicate that, contrary to his testimony, Hash did not visit his safe deposit box to make cash withdrawals during the period of time at issue. Assuming *arguendo* Downs did provide Hash with over forty-thousand dollars, the facts plainly suggest that the payment was front money for the *Workman* litigation, in which Downs held an interest, and not a personal loan. The absence of a written loan agreement is telling, as is the fact that Hash recorded only $234,709.33 income from the *Workman* case (one half the total fee) on his 1991 income tax return.

### Hash's Relationship with the Wagner Firm

Plaintiff Donald Baker was injured by an exploding wheel rim on October 6, 1990. He and his wife secured the representation of J. Roland ("Jim") Wagner (hereinafter "Wagner") to pursue a products liability case against Firestone and others. At the time, Wagner employed his son, Eric Wagner, as an associate. Eric Wagner left the firm on or about April 1, 1993, and Jim Wagner has since practiced alone.

Neither of the Wagners has prior experience with wheel rim litigation. Shortly after obtaining the Bakers' case, Wagner deemed it necessary to find co-counsel capable of handling the liability aspects of the case. Hash was then the acting chair of the American Trial Lawyers Association's ("ATLA") rim litigation group. Because of Hash's position with the group, and because of early representations by Hash concerning his success in multi-piece rim litigation, Wagner assumed Hash was an experienced multi-piece rim litigator. For this reason he invited Hash to join him as co-counsel for the Bakers. Hash agreed.

Although several venues were available, Wagner ultimately chose to file the Bakers' complaint in the Northern District of Ohio because of Hash's familiarity with the local practices of this Court and his relative proximity to the district. Additionally, it seems probable that Wagner looked favorably upon the possibility of drawing a sympathetic jury given the large number of unemployed Firestone employees in the Akron area. Wagner and Hash arranged for David Looney of Akron to serve as local counsel. Mr. Looney has since withdrawn from the case.

Both Wagner and Hash testified that Wagner remained chief counsel until Carl Reynolds entered the case in late 1993. But from the outset, Wagner and Hash maintained a

---

**2.** When testifying in Kansas, Hash stated that there was no note documenting either loan. Since then, he has received from Downs a note allegedly executed at the time of the second cash transfer.

clear division of labor; Wagner worked on the damages aspect of the case, and Hash covered liability. The two men communicated with each other regularly. Because Wagner was, ultimately, chief counsel, Hash would from time to time propose liability experts and offer a brief endorsement. Consequently, Hash shared with Wagner at least some of the information he had gained from Downs concerning Lee, Blate and the other experts expected to testify in this case. Wagner deferred to Hash completely and made no serious effort to adjudge the competency of the suggested experts. As Wagner credibly explained from the witness stand, "I relied entirely on John [in choosing liability experts], because I have no past experience whatsoever with wheel litigation." Tr. p. 390. Hash's testimony confirms Wagner's deference: "I felt he trusted me to make a recommendation and to follow through...." Tr. p. 110. Wagner does not remember any summary by Hash of the supposed strengths and weaknesses of the recommended witnesses.

Eventually, Wagner discovered that Hash had never taken a rim case to trial. This realization created a certain amount of concern about Hash's ability to present and examine the liability experts in a persuasive fashion. While recognizing his continued inability to evaluate the intrinsic merit of the liability evidence, Wagner took a greater interest in screening the demeanor of the expert witnesses. For this reason, he arranged for Eric Wagner to attend the depositions of Youngdahl, Maddox and a third witness, Ottfried Hahn. Eric Wagner had minimal contact with either the experts or Hash outside of the depositions themselves, and the sole information he received from the experiences was that contained in the deponents' actual testimony. He submitted expense reports for his involvement with these depositions, and those expenses were ultimately charged to the Bakers' file.

In addition to attending the three depositions with Hash, Eric Wagner also met Hash at a meeting of the ATLA rim litigation group in Newark, New Jersey in April of 1992. The meeting lasted approximately one hour. Three or four attorneys filled the meeting by discussing their personal experiences with specific rim cases. Eric Wagner could not recall any special reason for attending the meeting but surmised that he had been expected simply to monitor the group's activity. His testimony suggests that neither did he derive any substantive knowledge from the trip nor did he spend a significant amount of time with Hash, who had flown to the meeting separately. But once again, his costs were assessed to the Baker case.

Jim Wagner underwent open-heart surgery in 1993. As his recovery progressed, he became concerned that he would not be physically able to participate fully in the trial of this case, then set for January of 1994. After discussing the matter with Hash, Wagner resolved to bring an additional law firm into the case for the purpose of trying the issue of damages. Wagner knew of a firm in Macon, Georgia—the Reynolds & McArthur firm ("R & M")—that had won a substantial verdict against Firestone in a similar multi-piece rim case. Hash had previously met the name partners of that firm, and he and Wagner agreed that R & M would be a valuable addition to the Bakers' litigation team. Wagner asked Hash to approach R & M about associating on the case.

### Hash's Relationship with Reynolds & McArthur

Hash first met Carl Reynolds and Karen McArthur (the name partners of Reynolds & McArthur) in early March of 1991. R & M was trying a rim case against Firestone (the "*Webb*" case) in Lexington, Kentucky. Never having tried a rim case, and with the *Workman* trial drawing near, Hash flew to Lexington once he discovered the *Webb* trial was underway, hoping to watch the proceedings. Phone records introduced by Firestone indicate that Hash attempted to reach Carl Reynolds in Macon and again in Lexington before leaving for Lexington himself, but neither Hash nor Reynolds remembers speaking with the other before meeting in Lexington. Indeed, Reynolds testified with certainty that he did not speak to John Hash by phone before meeting him in person.

Upon reaching Lexington, Hash proceeded to the courthouse in which *Webb* was being

tried. During a lunch break, he approached Reynolds and McArthur in the street and asked if he could join them for lunch. Reynolds refused, explaining that he and McArthur needed to discuss the trial.

Later in the week, Hash joined McArthur and Reynolds for dinner. Throughout the meal, Reynolds and McArthur fielded Hash's questions concerning the *Webb* case and the particulars of their trial technique. R & M had invested a tremendous amount of time and energy into the preparation of *Webb*. Among other things, Karen McArthur had spent several days combing through Firestone documents in an Akron depository collecting the materials necessary to make the case. As Attorney Dennis Cathey explained, nearly all of Firestone's internal documents pertaining to rim design and development have entered the public domain as a result of discovery conducted in numerous split rim cases nationwide, a court order in multidistrict litigation, and as a result of hearings held before the National Highway Traffic Safety Board.

During the dinner, Hash mentioned the fact that he too had a rim case but did not discuss it in detail, preferring to focus on the *Webb* case and any trial practice tips he might glean from the R & M attorneys. He did not mention his associations with Downs and Williford, nor did he discuss the witnesses he intended to use in *Workman*.

Hash left Lexington before the *Webb* jury had returned its verdict. He asked Carl Reynolds to call him with the final result. Ultimately, the *Webb* jury returned a nineteen million dollar verdict for R & M's client. Reynolds telephoned Hash in North Carolina to share the news. Around the same time, McArthur returned a telephone call from Joseph Downs. Although she had never met Downs, she was familiar with his name and his former position with Firestone because of her preparation in *Webb*, in particular the time spent combing through Firestone documents in the Akron depository. Downs congratulated McArthur on R & M's recent success in *Webb* and, before closing the conversation, made several inquiries about the witnesses R & M had used. McArthur thought the call very surprising, but she quickly forgot it. She had never spoken with Downs before, nor has she since.

Shortly after meeting McArthur and Reynolds in Lexington, Hash made a number of calls to their office in Macon, Georgia, seeking permission to copy the *Webb* trial transcript and other documents the firm had collected in preparing the case. Reluctant to grant Hash's request, Reynolds chose not to return most of Hash's phone calls. Hash persisted, continuing to make similar calls until R & M became involved in this case in late 1993.

In the summer of 1991, Hash called Reynolds and for the first time asked to discuss the *Workman* case. Dissatisfied with Ken Williford's position on settlement, Hash was seeking a second opinion on the case's worth. A series of conversations followed in which Hash described the facts of *Workman* and solicited Reynold's independent estimation of the case's value. After Reynolds expressed the view that the case was indeed worth a substantial sum, Hash informed Reynolds that he, Hash, had co-counsel who disagreed. This said, he asked Reynolds to join the case. Reynolds refused to consider the option until Hash had settled his differences with Williford.

At some point, Hash informed Reynolds that Williford had left the case; he asked Reynolds if R & M would be interested in assuming a co-counsel position. Reynolds told Hash he would be interested in the case, provided the two could agree upon specific terms to govern R & M's involvement. No further discussions about such an agreement took place. Instead, on August 31, 1991, Hash—unbeknownst to Reynolds—wrote Firestone's lead counsel on *Workman* and stated affirmatively that R & M would be entering the *Workman* case should it proceed to trial. Hash and Firestone settled *Workman* less than two months later.

After he settled *Workman*, Hash left a telephone message informing Reynolds that the case had been resolved. Reynolds subsequently learned from a Firestone attorney that Hash had attempted to push the settlement discussions by "dropping" R & M's name in a letter to Firestone. It is not

surprising that this information cooled Reynolds' regard for Hash.

Shortly thereafter, Hash invited Reynolds and McArthur to address a meeting of the ATLA rim litigation group in Indiana. Reynolds refused. Hash persisted and eventually asked Reynolds and McArthur to talk about the *Webb* case before a group meeting closer to home in Atlanta. Although still miffed by Hash's conduct in *Workman,* Reynolds recognized a business opportunity to cultivate future referrals and/or associations on rim cases, and he agreed to attend the Atlanta meeting.

Accompanied by McArthur, Reynolds attended the ATLA rim litigation group's meeting in Atlanta. After mingling over coffee, Reynolds gave an informal speech concerning *Webb* to the small group of people in attendance. He then fielded questions before leaving the meeting—an affair which lasted less than two hours. Although Hash continued to place occasional calls to R & M's office concerning his wish to review the *Webb* transcript, a considerable period of time lapsed before he again spoke with Reynolds or McArthur in person.

After agreeing with Wagner that R & M should be asked to take a role in this case, Hash attempted to reach Reynolds by telephone in August and again in September of 1993. Reynolds was trying a case in a different state at the time and therefore did not immediately return Hash's calls. When he returned to Macon, and before he had had the chance to telephone Hash, Reynolds received a phone call from Jim Wagner. Wagner discussed the *Baker* case, explained the existing division of labor between Hash and himself, and invited R & M to become involved. Reynolds agreed to consider the offer, but, given his prior experience with Hash in *Workman,* he expressly forbid Wagner from using R & M's name in any way whatsoever until a signed agreement had been made.

A series of written and oral conversations between Reynolds and Wagner ensued, with Wagner, in turn, discussing things with Hash. Reynolds very quickly conditioned R & M's entry into the case on Wagner's willingness to name Reynolds chief counsel. Having gained this concession, he openly questioned the need to retain Hash. Given Hash's work to that point, Wagner was reluctant to remove him from the case completely, but he and Hash both understood and agreed that Hash's continuing role in the case would be determined by Reynolds should R & M come on board.

Wagner and Hash answered Reynolds' preliminary questions about the facts of the case, and Hash posted to R & M two boxes of discovery materials produced by the defendants, including responses to interrogatories and requests for admissions together with various deposition transcripts. Hash also sent the pre-trial report he and Wagner had prepared pursuant to this Court's order, and, at Reynolds' request, a hastily comprised "trial plan," which consisted of a list of the plaintiffs' witnesses and a single paragraph description of the anticipated subject of their testimony.[3] Both Reynolds and Hash testified at the hearing that Reynolds did not ask for, and Hash did not provide, any personal analysis or discussion of the liability experts or of the liability case in general. Given Reynolds' demonstrated knowledge in this area, Hash's equally apparent lack of true knowledge, and the personal credibility of the R & M attorneys, the Court finds this assertion believable.

On December 7, 1993, R & M sent Wagner a written proposal finalizing the terms to govern their joint representation of the Bakers. Wagner and Hash accepted the proposal the following day.

---

3. During the hearing, counsel for Firestone questioned Hash separately about the trial plan he sent to R & M and about a facsimile letter dated November 11, 1993 (DX 164) containing a list of plaintiffs' witnesses. Tr. pp. 91–92, 156. A review of the testimony and the exhibits at issue makes it clear that the letter (DX 164) and the trial plan are one and the same document. *Cf.*

DX 91 (facsimile letter from Hash to Reynolds and McArthur dated November 10, 1993, in which Hash promises to "fax to you tomorrow (i.e., November 11, 1993) my Trial Plan"). The Court reviewed the so-called "trial plan" *in camera* and delivered a redacted version to Firestone for its use in the disqualification proceeding.

Firestone filed its first motion to disqualify Hash in this case on December 2, 1993. When he received the motion, Hash forwarded a copy of it, together with a copy of his response, to R & M. Questioned separately by Wagner and by Reynolds, Hash mentioned for the first time to either that he had formerly shared office space with Downs. He assured his co-counsel that the substantive allegations of Firestone's motion were groundless, and he went so far as to promise to pursue Rule 11 sanctions against Firestone. Neither Wagner nor Reynolds questioned him further on the subject, and on January 4, 1994, the Court denied the motion to disqualify, seemingly putting the issue to rest.

R & M's attorneys formally moved for admission on January 24, 1994, and the Court granted their motion two days later.

Attorney Steve Warren joined R & M as an associate attorney located in Asheville, North Carolina on March 15, 1994. Because McArthur was expecting a child in April, Warren assumed primary responsibility for pretrial supervision of the Baker case file, a task normally handled by McArthur. The case gave him his first opportunity to engage in wheel rim litigation. Shortly after Warren started working for R & M, he received from the Macon office the discovery materials originally sent to R & M by Hash the previous fall. Within several weeks, he also obtained the Wagner firm's entire *Baker* file, which consisted of seventeen banker's boxes filled with numerous file folders labelled by topic.[4]

In assessing the trial readiness of this case, Warren reviewed certain portions of the Wagner file, in particular those folders labelled "lay witness" and "expert witness." The latter contained the experts' depositions and correspondence related to the scheduling of the same. Warren testified at the hearing that he has reviewed the depositions of each of the experts as part of his efforts to determine what additional trial preparation needs

to be done. He has since taken medical depositions and follow-up depositions.

Warren received two more boxes of discovery materials from Hash in July of 1994. Included in those boxes were three documents that the magistrate judge ultimately ordered to be delivered to defendants other than Firestone pursuant to an order to compel. Warren retrieved those documents from the boxes; he has not reviewed any other material within those boxes.

Warren is the only R & M attorney to have reviewed any of the materials sent by Hash and Wagner. Pursuant to this Court's order, those materials have remained under seal since December 8, 1994.

On April 11, 1994, Warren and Reynolds flew to Akron to attend a status conference scheduled by the Court. They met Hash at the airport and drove with him to the courthouse. The ongoing discovery proceedings in Kansas had unearthed highly suspicious evidence concerning Hash's relationship with Downs, causing Hash to anticipate a confrontation at the imminent conference. En route to that conference, Hash told Reynolds and Warren for the first time that he had given half of his fee in *Workman* to Joseph Downs as repayment for a previous loan. Reynolds responded simply, "That's bad, that's very bad." Recognizing immediately the ethical implications of Hash's conduct, Reynolds resolved to remove Hash from the case or, in the alternative, to withdraw his own firm.

Hash testified that, following his April confession, he perceived a deliberate estrangement between his co-counsel and himself. Indeed, Reynolds and Warren flew to California within a few weeks of the conference to discuss Hash's conduct with Wagner. Wagner agreed that Hash would have to remove himself from the case. The three attorneys placed a call to Hash in North Carolina and asked him to withdraw from the case. Hash promised to do so. The following month found Hash in the hospital recovering from surgery, not yet having moved to withdraw from the *Baker* case. Prompted

---

4. Warren's secretary compiled a list of the various headings contained on the file labels. This list or "inventory" was used by the Court and the parties alike in determining what, if any, portion of the Wagner file was relevant to Firestone's motion and therefore subject to disclosure through discovery.

by Wagner, Reynolds and Warren telephoned Hash in the hospital to make certain Hash still intended to withdraw. Hash assured them that he did, and on August 8, 1994, Hash finally filed a motion for leave to withdraw and for a determination of his appropriate fee.

Although their memories appear to conflict on the exact date, both Warren and Reynolds testified that, during one of the calls to Hash concerning his withdrawal, Reynolds asked Hash various "housekeeping" questions about the case, such as, Have you supplemented the interrogatories?, and, Who are their experts? These discussions do not appear to have been substantive in nature. Rather, it would appear that, anticipating Hash's final exit, Reynolds simply wished to assure a smooth transition.

Communication between Hash and his co-counsel did not discontinue completely following Hash's promise to withdraw. Warren spoke with Hash several times seeking introductions to witnesses, including Michael Maddox, and confirmation that certain discovery responses had been supplemented. On June 29, 1994, Hash offered by letter to assist Warren in preparing a response to a Firestone reply brief in support of a joint motion by several defendants for a protective order. DX 163. In writing the original response, Warren had apparently stated that Dr. Hahn attributed liability to Firestone simply because Firestone alone made the particular type of rim involved in Mr. Baker's injury. As his letter shows, Hash sought to make clear Hahn's appreciation of the fact that another defendant, Kelsey-Hayes, had also manufactured a very few rims of the same sort. Warren telephoned Hash to discuss the matter; in that conversation, Hash reiterated the view expressed in his letter.

Later, on July 6, 1994, Warren travelled to the Wake Forest University in Winston-Salem to do research at the law library. He arranged to meet Hash there to pick up the aforementioned boxes of discovery material. They talked briefly about the factual background of the *Baker* case.

Firestone filed its motion to disqualify all of the plaintiffs' attorneys on July 8, 1994; contact between Hash and R & M has virtually ceased since that time.

## II

■ By its motion, Firestone seeks to bar Attorney John Hash, as well as the Wagner and Reynolds & McArthur law firms, from participating in the prosecution of Plaintiffs' case. Disqualification is necessary, Firestone contends, to defend the ethical considerations reflected in the Code of Professional Responsibility.[5] The Court retains inherent authority to police the ethical conduct of the lawyers who appear before it and to uphold the ethical norms embodied in the Code of Professional Responsibility. *United States v. Miller,* 624 F.2d 1198, 1201 (3rd Cir.1980); *Kitchen v. Aristech Chemical,* 769 F.Supp. 254, 256 (S.D.Ohio 1991), *quoting Ex parte Burr,* 22 U.S. (9 Wheat.) 529, 531, 6 L.Ed. 152 (1824). "Disqualification of counsel is but one of several avenues available to a court in its attempt to insure that [the canons of the Code] are not violated." *Freeman v. Chicago Musical Instrument Co.,* 689 F.2d 715, 721 (7th Cir.1982). Indeed, given the severity of the sanction, this Court has previously cautioned that disqualification "is a drastic measure which courts will not impose unless absolutely necessary." *Gould, Inc. v. Mitsui Mining & Smelting Co.,* 738 F.Supp. 1121, 1124–1125 (N.D.Ohio 1990) (Joiner, J., sitting by designation); *cf. Freeman,* 689 F.2d at 721; *Miller,* 624 F.2d at 1201; *Kitchen,* 769 F.Supp. at 257.

In deciding Firestone's motion, this Court must consider two questions with respect to each attorney Firestone seeks to disqualify. First, it must be asked whether the attorney's present involvement in the case impinges on the ethical considerations underlying the Code. If that question is answered affirmatively, the inquiry must be made whether the impingement is such as to require the attorney's disqualification. *Gould,* 738 F.Supp. at 1123; *see also Freeman,* 689

5. Local Rule 1:5.1 states in part: "All attorneys admitted to practice in this Court shall be bound by the ethical standards of the Code of Profes- sional Responsibility adopted by the Supreme Court of Ohio, so far as [those rules] are not inconsistent with Federal Law."

F.2d at 722; *Miller*, 624 F.2d at 1201; *Kitchen*, 769 F.Supp. at 257.

Of primary concern to Firestone is the attorney's duty of confidentiality, recognized in Canon 4 [6] and, tangentially, in Canon 9.[7] Disciplinary rule 4–101(B)(2) expressly forbids an attorney's use of a client's confidences or secrets to the client's disadvantage.[8] And plainly an attorney cannot undertake to represent a party with interests opposed to those of a present or former client without raising apprehension about the disclosure of that client's confidences. Consistent with Rule 4–101(B)(2), trial courts often protect client confidentiality by disqualifying an attorney with a conflict of interest upon the motion of the client whose confidences stand at risk.

■ The attorneys representing the plaintiffs in this case have not served as counsel for Firestone. They hold no immediate professional duty to maintain Firestone's confidences and therefore cannot be said personally to have infracted Canon 4 or the disciplinary rules thereunder. All the same, disqualification may be a necessary and appropriate measure. Given its obligation to protect both the individual client's and the public's expectation of lawyer-client confidentiality, the court has ample discretion to disqualify an attorney who has been exposed to, and is therefore tainted by, the opposing party's secrets or confidences by virtue of his relationship with the opponent's present or former attorney. *Freeman*, 689 F.2d at 721.

### Proving Disclosure of Confidences

■ The task for the party moving for disqualification is to demonstrate that the challenged lawyer has in fact either disclosed, or been tainted by, the movant's confidence. Direct evidence of actual disclosures is at once the most effective and the most difficult method of carrying this burden. On motions to disqualify an attorney who is presently representing or has formerly represented the movant on another matter, most courts soften the burden of production by enforcing an irrebuttable presumption of prejudicial disclosure once a substantial relationship between that other matter and the immediate litigation is established. *T.C. Theatre Corp. v. Warner Bros. Pictures, Inc.*, 113 F.Supp. 265, 269 (S.D.N.Y.1953) (Weinfield, J.); *see also City of Cleveland v. Cleveland Elec. Illuminating Co.*, 440 F.Supp. 193 (N.D.Ohio 1976) (citing *T.C. Theatre*), *aff'd*, 573 F.2d 1310 (6th Cir.1977), *cert. denied*, 435 U.S. 996, 98 S.Ct. 1648, 56 L.Ed.2d 85 (1978); *Sarbey v. Nat'l City Bank*, 66 Ohio App.3d 18, 23, 583 N.E.2d 392 (Summit County 1990) (citing *T.C. Theatre*); Paul R. Taskier & Alan H. Casper, *Vicarious Disqualification of Co–Counsel Because of "Taint,"* 1 Geo. J Legal Ethics 155, 157–158 (1987). A party moving to disqualify as "tainted" an attorney who is or was professionally associated in the same firm with the movant's own attorney enjoys the benefit of a similar presumption: to wit, any attorney within a law firm is presumed to have learned the confidences of *all* of the firm's clients. *Freeman*, 689 F.2d at 722; *Laskey Bros. of W. Va. v. Warner Bros. Pictures, Inc.*, 224 F.2d 824, 826 (2nd Cir.1955), *cert. denied* 350 U.S. 932 (1956); *see generally* Taskier & Casper, 1 Geo.J.Legal Ethics at 158–159. Disciplinary rule 5–105(D) [9] of the

**6.** Canon 4 provides: "A Lawyer Should Preserve the Confidences and Secrets of a Client." *Model Code of Professional Responsibility* Canon 4 (1994).

**7.** Canon 9 provides: "A Lawyer Should Avoid Even the Appearance of Professional Impropriety." *Model Code of Professional Responsibility* Canon 9 (1994).

**8.** Disciplinary Rule 4–101, "Preservation of Confidences and Secrets of a Client," states in part:

(A) "Confidence" refers to information protected by the attorney-client privilege under applicable law, and "secret" refers to other information gained in the professional relationship that the client has requested be held inviolate or the disclosure of which would be embarrassing or would be likely to be detrimental to the client.
(B) ... [A] lawyer shall not knowingly:
(1) Reveal a confidence or secret of his client.
(2) Use a confidence or secret of his client to the disadvantage of the client.
(3) Use a confidence or secret of his client for the advantage of himself or of a third person unless the client consents after full disclosure.
*Model Code of Professional Responsibility* DR 4–101 (1994).

**9.** The rule states: "If a lawyer is required to decline employment or to withdraw from employment under DR 5–105, no partner or associ-

Model Code (which essentially extends a lawyer's conflicts of interest to his partners) at once strengthens and is strengthened by the presumption that firm members have shared their clients' confidences. Taskier & Casper, *supra*, at 1, n. 1. The movant establishes the presumption of taint by showing that the immediate litigation relates substantially to those matters handled for the movant by the challenged attorney's present or former firm during the course of the attorney's employment with the firm. *Freeman*, 689 F.2d at 722. This Court has recognized the right of the party opposing disqualification to rebut the presumption of shared confidences among firm members. *Cleveland Electric*, 440 F.Supp. at 209; *see also Freeman*, 689 F.2d at 722, *citing Novo Terapeutisk Laboratorium A/S v. Baxter Travenol Laboratories, Inc.*, 607 F.2d 186, 197 (7th Cir.1979) (*en banc*) (holding that presumption of taint among firm members may be rebutted). As the decisions accepting rebuttal evidence implicitly recognize, the strength afforded a presumption of taint properly diminishes as the circle of imputation grows.

### Proving Disclosure of Confidences to Co–Counsel

With the possible exception of Hash, the attorneys Firestone seeks to disqualify not only have not represented Firestone, they also have not practiced law with a Firestone attorney. Neither of the presumptions discussed above directly applies to this case, and thus two questions remain: what is the nature of the evidence (i.e., what is the burden of production) necessary to demonstrate a *prima facie* case of co-counsel taint, and who bears the ultimate burden of persuasion on the issue?

While generally willing to disqualify an attorney with a conflict of interest, as well as all members of his or her firm, upon proof of facts raising a presumption of disclosure, the courts have not agreed on the propriety of similarly disqualifying the attorney's co-counsel absent actual evidence of disclosure of client confidences. *Cf. NCK Organization Ltd. v. Bregman*, 542 F.2d 128 (2nd Cir.1976) (holding that co-counsel may be presumed tainted upon showing of "possibility" that co-counsel received client secrets); *Brennan's, Inc. v. Brennan's Restaurants, Inc.*, 590 F.2d 168 (5th Cir.1979) (holding that co-counsel should not be disqualified absent proof of actual disclosure).[10] In its February 21, 1995 Memorandum and Opinion, this Court refused to adhere rigidly either to the relatively loose standard for establishing co-counsel taint endorsed in *NCK* or to the strict standard espoused in *Brennan's*:

> Generally, this Court will require a party in Firestone's position to prove specifically that co-counsel for the opponent has received confidential information before the Court will order said co-counsel disqualified from further representation. But where one attorney has been proven tainted, the Court will not turn a blind eye to circumstantial evidence that suggests a strong probability that co-counsel has likewise been affected. Such a case by case analysis is necessary, it is believed, to preserve the delicate balance between the ethical considerations encompassed by Canon [Four and Canon] Nine and the right of a litigant to select counsel of his or her choosing.

Docket # 247, at 8–9.

■ The Court remains of the opinion that disqualification cases—and especially cases such as this involving the possible taint of co-counsel—resist facile resolution by rote application of a standardized test. *Gould*, 738 F.Supp. at 1124; *Cleveland Electric*, 440 F.Supp. at 210. It appreciates, however, the benefit a common analytical framework provides in guiding the courts' deliberations and promoting the growth of an informative body of case law. Taskier and Casper, 1 Geo.J.Legal Ethics, at 160–161. Having conceded that certain evidence short of proof of actual disclosure may suffice to establish taint, and given the historical importance of legal presumptions in disqualification cases,

---

ate of his or his firm may accept or continue such employment." *Model Code of Professional Responsibility* DR 5–105(D) (1970).

**10.** The Court discussed these cases and the two competing views they represent at some length in its Memorandum and Opinion of February 21, 1995. Docket # 247.

the Court has preserved the possibility that certain types of proof may be sufficiently reliable to support a rebuttable presumption of taint.

In their article, Taskier and Casper attempt to "take into account all situations [involving co-counsel] that can reasonably raise a presumption that confidential information has been misused." *Id.*, at 189. From these situations, they distill three categories of proof, each of which, they argue, provides an independent basis for that presumption: substantive discussions between co-counsel, joint preparation of litigation for trial, and the apparent receipt of confidential information. *Id.* Having reviewed the case law upon which the authors base their conclusion, the Court agrees that the three showings are certainly of a kind which, in most cases, will not only raise a reasonable inference of taint, but will also, if not rebutted, fairly require a presumptive finding of taint.[11] This conclusion is consistent with the Court's prior statements, and it has the advantage of focusing the analysis of courts and litigants alike in cases where direct evidence of disclosures is unavailable. Provided the evidentiary support is sufficient, the Court will generally allow a party moving for disqualification of co-counsel to satisfy her *prima facie* case with proof of substantive discussions between counsel, joint preparation of litigation for trial, or the apparent receipt of confidential information.

### Operation of the Presumption of Co–Counsel Taint

Although it accepts Taskier and Casper's premise that a presumption of taint may arise in co-counsel disqualification proceedings, the Court disagrees with them concerning the presumption's proper operation and effect. In their paper, the authors conclude that, once the presumption has been established, "[c]hallenged counsel may rebut the presumption upon a showing, *by a prepon-*

*derance of the evidence,* that the alleged *basis* for the presumption did not in fact occur." *Id.* (emphasis added). With this conclusion, they depart in two significant respects from the traditional application of evidentiary presumptions. First, the authors designate as "rebuttal" the opponent's defense against the existence of the predicate facts, thereby depriving him of the separate opportunity to rebut the presumed fact (taint) itself. In so doing, the authors deny the opponent a critical element of his defense. Properly, the party denying the presumed fact must have both the opportunity to contest the existence of the base facts (which facts the *proponent* must prove by a preponderance of the evidence) *and,* if the base facts are proven, the opportunity to *rebut* the resulting presumption with evidence that co-counsel was *not* tainted, the existence of the base facts notwithstanding. *See generally St. Mary's Honor Center v. Hicks,* —— U.S. ——, —— ——, 113 S.Ct. 2742, 2747–2750, 125 L.Ed.2d 407, 416–419 (1993) (operation of rebuttable presumptions described in context of discussion of the *McDonnell Douglas* rebuttable presumption of discrimination); Charles A. Wright & Kenneth W. Graham, Jr., 21 *Federal Practice & Procedure* § 5122, p. 563 (1977) (distinguishing between attacks directed to the existence of the base facts and attempts to rebut the presumed fact).

More significantly, Taskier and Casper would require the rebutting party to *disprove* the predicate facts, thus shifting not merely the burden of *production,* but also the burden of *persuasion,* from the party invoking the presumption to the party defending against it. While it may be appropriate, as a matter of substantive law, to assign the ultimate burden of persuasion in disqualification proceedings to the party defending against disqualification, that burden—once established—cannot be transferred simply by application of an evidentiary presumption. Fed.R.Evid. 301;[12] *St. Mary's Honor Center*

---

11. Firestone has stated repeatedly that it need not prove actual disclosures but only a fair risk that disclosures were made. By its nature, the presumption addresses that concern by allowing for a finding of taint upon proof of circumstances (the predicate facts) that create a real risk of disclosure.

12. The rule reads as follows: "In all civil actions and proceedings not otherwise provided for by Act of Congress or by these rules, a presumption imposes on the party against whom it is directed the burden of going forward with evidence to rebut or meet the presumption, *but does not shift to such party the burden of proof in the sense of*

*v. Hicks,* —— U.S. at ——, 113 S.Ct. at 2747, 125 L.Ed.2d at 416; Wright & Graham, *supra,* at pp. 556, 570. Assuming the burden of persuasion rests initially with the movant, the rebutting party need only present admissible evidence that, *if believed,* would support a finding that the challenged attorney has not in fact been tainted. He need not *disprove* either the predicate facts or the presence of taint. *St. Mary's,* —— U.S. at ——, 113 S.Ct. at 2747, 125 L.Ed.2d at 416; *see also Novo Terapeutisk,* 607 F.2d at 197 (holding that lawyers' affidavits stating that the lawyers did not receive information related to the matter in litigation from their former partner, the movant's attorney, "clearly and effectively" rebutted the presumption of disclosure arising by virtue of former partnership); *Silver Chrysler Plymouth, Inc. v. Chrysler Motors Corp.,* 518 F.2d 751, 757 (2nd Cir.1975) (holding that attorney's express denial of receipt of the confidential information at issue, supported by the affidavits of co-workers, rebutted any presumption of taint arising from attorney's former association with the movant's firm), *overruled on other grounds, Armstrong v. McAlpin,* 625 F.2d 433 (2nd Cir.1980); *Cleveland Electric,* 440 F.Supp. at 209, 211 (affirmative evidence showing that no disclosure occurred rebuts a presumption of disclosure among firm members).

Of course, the rebutting party must introduce rebuttal evidence that is sufficiently probative in order to succeed in his rebuttal. In *Nova,* 607 F.2d at 197, the Seventh Circuit expressly reserved ruling on the question of whether some "special quality or quantity" of evidence is required to rebut the similar presumption of shared confidences within a firm. In subsequent decisions that court, drawing on language in *Nova,* has demanded rebuttal evidence of a quality that "clearly and effectively" shows that the challenged attorney has no knowledge of the movant's protected confidences. *Schiessle v. Stephens,* 717 F.2d 417, 420 (7th Cir.1983); *Freeman,* 689 at 723. In *Cleveland Electric,* this Court found ample "probative, material evidence affirmatively showing that no confidential disclosure in fact occurred" to rebut the pre-

sumption of shared secrets. 440 F.Supp. at 209. Thus, to meet his burden of production, the rebutting party must offer more than a conclusory denial of taint. He must provide probative and material evidence concerning the relationship between the challenged attorney and the movant's attorney tending to show that the former has not been exposed to confidential information.

Admittedly, various decisions blur the distinction between the determination of whether an opponent has met the burden of producing evidence to rebut the presumption and the determination of the ultimate issue, that is, whether the proponent has (either by way of a not rebutted presumption or simply by the greater weight of the circumstantial evidence) proven taint. *See, e.g., Panduit Corp. v. All States Plastic Mfg. Co.,* 744 F.2d 1564, 1581 (Fed.Cir.1984) ("The shared confidences presumption is fully rebutted by a finding of the nonexistence of the presumed fact, as made here at trial"); *Schiessle v. Stephens,* 717 F.2d 417, 421 (7th Cir.1983) (*dictum* that, to determine whether presumption has been rebutted, trial court must decide whether client confidences were passed from attorney with conflict to other members of his firm); *Haagen-Dazs Co., Inc. v. Perche No! Gelato, Inc.,* 639 F.Supp. 282, 286 (N.D.Cal.1986) (holding that lawyer's statements to the contrary insufficient to "rebut" inference that he was in fact exposed to client confidences). Such decisional shortcuts are understandable in light of the fact that the court acts simultaneously as finder of fact and law. Practically speaking, evidence that is sufficiently clear to raise in the court's mind a factual question about the existence of taint (thereby rebutting the presumption) will often go as far as to convince the court (as fact finder) that there is in truth no taint. Conversely, rebuttal evidence may be sufficient to destroy the presumption but not to sway the court from a remaining inference of taint drawn from the movant's evidence, leaving the court to conclude summarily that the showing of taint has not been "rebutted." Precisely applied, a presumption of taint should not be used to shift the bur-

the risk of *nonpersuasion,* which remains throughout the trial upon the party on whom it was originally cast." Fed.R.Evid. 301 (emphasis added).

den of persuasion. The court must first consider whether there is competent rebuttal evidence tending to prove that the challenged attorney has not been tainted. If there is not, the court is required to find taint. If rebuttal evidence exists, the presumption falls, and the court then may weigh that evidence against any remaining *inference* of taint created by the base facts of the rebutted presumption.

### The Burden of Persuasion

■ As noted above, although the presumption employed cannot of itself shift the burden of persuasion to the party defending against allegations of taint, that burden may conceivably be assigned to the defending party under the substantive law governing disqualification proceedings. Firestone insists that Plaintiffs carry this burden, docket #272, p. 2, and this may be the assumption underlying Taskier and Casper's analysis. Firestone points out that Judge Theis, when ruling on Firestone's motion to disqualify in *Kelling,* assigned the ultimate burden of proof to Hash, the attorney Firestone sought to disqualify. *Kelling* Memorandum, p. 20. Attorney conduct in the District of Kansas is governed by the Model Rules of Professional Conduct, as adopted and interpreted by the Kansas Supreme Court. *Pacific Employers Ins. Co. v. P.B. Hoidale Co., Inc.,* 789 F.Supp. 1112, 1113 (D.Kan.1992), *citing* D.Kan.Rule 407(a); Kan.S.Ct.R. 226. The comment following Rule 1.10 of the Model Rules as adopted provides in pertinent part: "Application of paragraphs (b) and (c) [concerning the imputation of taint to all members of a firm] depends on a situation's particular facts. In any such inquiry, *the burden of proof should rest upon the firm whose disqualification is sought." Model Rules of Professional Conduct* Rule 1.10 cmt. (1988) (emphasis added). Consistent with this commentary, the Kansas Supreme Court has placed the ultimate burden of persuasion in disqualification cases with the lawyer or firm whose disqualification is sought. *Parker v. Volkswagenwerk Aktiengesellschaft,* 245 Kan. 580, 781 P.2d 1099, 1106 (1989). Following *Parker* and subsequent District of Kansas decisions adopting its holding, Judge Theis

correctly required Hash to bear the final burden of persuasion.

■ Unlike the Model Rules, the Code of Professional Responsibility has no provision purporting to assign the burden of persuasion in disqualification cases. Typically, one expects the burden to fall on the moving party. *Panduit,* 744 F.2d at 1579. The Court acknowledges the compelling reasons that may be invoked to justify assigning the burden to the opponent of disqualification, but its review of various Ohio decisions under the Code leads to the conclusion that the burden of persuasion remains at all times with the party requesting disqualification. *Cleveland Electric,* 440 F.Supp. at 211 (implying that, once presumption of disclosure is rebutted, movant retains burden of proving actual disclosure); *Janis v. Castle Apartments, Inc.,* 90 Ohio App.3d 224, 229, 628 N.E.2d 149 ("In the absence of any formal attorney-client relationship ... it is appropriate that the client prove both that confidences were revealed and that those confidences will prejudice the client...."); *Sarbey,* 66 Ohio App.3d at 23, 583 N.E.2d 392; *cf. Panduit,* 744 F.2d at 1579; *Duncan v. Merrill Lynch,* 646 F.2d 1020, 1029 (5th Cir. 1981), *overruled on other grounds, Gibbs v. Paluk,* 742 F.2d 181 (5th Cir.1984); *Dodson v. Floyd,* 529 F.Supp. 1056, 1066 (N.D.Ga. 1981).

### The Applicable Framework

In summary, the party moving to disqualify co-counsel bears the burden of proving that co-counsel has in fact been tainted. The movant may offer direct evidence of disclosure or, alternatively, may establish a presumption of taint by showing substantial communications, joint preparation for litigation or the apparent receipt of confidences. If the movant successfully raises the presumption, the opponent will have the opportunity to rebut it with material, probative evidence that points toward non-disclosure. If the presumption is rebutted, the movant may in some instances prove taint, depending on the persuasive force of his evidence when weighed against the rebuttal evidence.

In those instances in which the movant proves taint, the trial court considers the

necessity of disqualification. Although the integrity of the bar and the moving party's expectation of confidentiality deserve strong protection, the court should not order disqualification without first balancing less drastic alternatives with the opposing party's right to be represented by counsel of his choosing. *Miller,* 624 F.2d at 1201; *Kitchen,* 769 F.Supp. at 256–257.

## III

■ John Hash and Joseph Downs conjoined to commit several ethical violations. A dispassionate, thorough assessment of the facts fairly suggests that Hash proved a convenient vehicle for Downs' Svengalian machinations. Be Downs' role what it may, Hash cannot shield himself in the other's greater infamy. "Bonitas non est pessimis esse meliorem." [13]

Of primary concern is whether, during the course of their relationship, Downs violated DR 4–101(B) by imparting to Hash secrets or confidences belonging to Downs' former client, Firestone.

In view of Downs' pervasive involvement in *Workman,* the proof of actual disclosure is surprisingly thin. Noticeably absent is any evidence suggesting that Downs taught Hash hidden secrets concerning Firestone's wheel rims themselves, either as to their design or production. To show actual disclosures, Firestone has focused almost entirely on Hash's testimony that he on more than one occasion elicited Downs' opinion on the abilities of various rim experts and attorneys. The Code defines "secrets" more broadly than it does "confidences." Secrets include "information gained in the professional relationship ... the disclosure of which would be embarrassing or would be likely to be detrimental to the client." DR 4–101(A). While the Court feels the term should be construed liberally, it has difficulty applying it to every off-hand, subjective comment by Downs to the effect of "so-and-so is a good attorney" or a "tough witness." True, given his role in shaping Firestone's defense in rim cases, Downs' seemingly personal view may reflect

the conventional wisdom of *Firestone*'s defense team. Conceivably, an opponent privy to Downs' opinion might shape his or her litigation strategy around particular witnesses in hopes of exploiting Firestone's acknowledged weakness. The risk of such an occurrence, and certainly of any meaningful occurrence, would appear to diminish when discussing experts widely familiar to both sides of the bar in this area of litigation. Thus, whatever taint resulted from the brief exchanges between Hash and Downs concerning Knauss, Nonnamaker, Youngdahl and Lee is of the weakest sort. Downs' remarks about Blate, however, were of a different character. By pointing Hash toward a potential witness with a possible bias against Firestone, Downs released concrete information held by him solely because of his employment at Firestone and of the type that might be detrimental to Firestone.

Proof of actual disclosures aside, the longstanding personal and professional relationship between Hash and Downs, highlighted by Downs' immediate involvement and financial interest in the *Workman* case, is more than sufficient to support a presumption that Downs disclosed Firestone secrets and confidences to Hash. Assuming *arguendo* that Hash's testimony rebuts the presumption, the tremendous weight of the underlying evidence nonetheless convinces the Court that disclosures took place. Downs has violated DR 4–101(B) and has tainted Hash in the process.

Hash and Downs infringed other provisions of the Code of Professional Responsibility. DR 5–105(A) is closely related to DR 4–101(B). It states in part: "A lawyer shall decline proffered employment if the exercise of his independent professional judgment on behalf of a client will be or is likely to be adversely affected by the acceptance of the proffered employment...." Downs secured for himself a financial interest in the *Workman* case. In return, he took an active role in preparing the case against Firestone, his former client. Specifically, the facts show that Downs reviewed the Workmans' com-

---

**13.** "It is not goodness to be better than the worst." Seneca. *Epistulae morales ad Lucili-* *um.*

plaint against Firestone and gave it his approval. He screened and prepared Dr. Maddox to testify as an expert witness against Firestone, and he suggested other witnesses to be called on the Workmans' behalf. It was impossible for Downs to play this part in the *Workman* case without placing a serious strain on his independent professional judgment when called upon to determine whether his duty of confidentiality to Firestone was being placed at risk.

DR 2–107(A) provides:

Division of fees by lawyers who are not in the same firm may be made only with the prior consent of the client and if all of the following apply:

(1) The division is in proportion to the services performed by each lawyer or, if by written agreement with the client, all lawyers assume responsibility for the representation;

(2) The terms of the division and the identity of all lawyers sharing in the fee are disclosed in writing to the client;

(3) The total fee is reasonable.

Hash's payment to Downs of one half of his fee in *Workman* constituted a plain violation of Rule 2–107(A). Hash has admitted that no writing exists which reflects the agreement, and there is no evidence to demonstrate that the client was informed.

The facts show that Hash's and Downs' cooperation in *Workman* violated several ethical rules, including the rule prohibiting disclosure of client confidences. The Court deems Hash's disqualification necessary to remedy this violation for two reasons. Given the actual disclosures shown, and the risk that additional disclosures took place, nothing short of Hash's disqualification will suture the wound caused by Downs' breach of confidentiality. Moreover, the fact that Hash and Downs actively and intentionally infracted the Code of Professional Responsibility warrants a strong censure.

Accordingly, the Court orders that Hash be disqualified. In addition, he is precluded from recovering any fee or costs in relation to this case. Should the parties incur addi-

tional litigation expenses as a result of this Court's order, those costs must be borne by plaintiffs, who shall have the right to recover against Hash. Other than those items that have become part of the record in this case, none of Hash's Firestone-related work product—including his discovery—may be used to prosecute this case.

Because it is highly unlikely that either Maddox or Blate would have entered this litigation but for Downs' breach of professional duties, both men must be excluded from further participation in the case. Assuming *arguendo* the Court erred in concluding that the remaining experts identified have not been tainted, the Court remains of the opinion that Plaintiffs should be permitted to make use of their testimony. The record clearly shows that these witnesses are widely familiar with litigation of this sort. To bar their participation would be merely a windfall for Firestone at Plaintiffs' expense as opposed to real or necessary protection against use of client confidences.

### *The Reynolds & McArthur Firm*

 Firestone does not argue that it has identified actual disclosures made by Hash (or anyone else) to R & M, and the factual record is void of such proof. While Hash on several occasions provided the names of his proposed expert witnesses to R & M, he did not provide—as he did to Wagner—an oral description of the witnesses' supposed strengths. The relevant portions of the "trial plan" hastily prepared by Hash contain nothing more than the most perfunctory descriptions of the witness's anticipated testimony.[14] It offers nothing (and Firestone points to nothing) that might convey Downs' or Firestone's assessment of the expert's particular strong or weak points. Similarly, Firestone has identified nothing within the various depositions admittedly reviewed by Steve Warren that conveys a Firestone secret or confidence wrongly obtained by Hash.

Firestone bases its case against R & M on circumstantial evidence offered to raise a presumption of taint, focusing primarily on a

---

**14.** The redacted version of this trial plan, as well as various depositions reviewed by Warren, has

been made part of the public record by Firestone.

series of allegedly substantive discussions shared between Hash and members of the R & M firm. Reynolds, McArthur and Hash did discuss rim litigation generally, and the *Webb* case in particular, during their first meeting in Lexington. However, the Court was persuaded by the testimony that Hash used the opportunity to seek guidance from McArthur and Reynolds rather than to display his own knowledge (or lack thereof) on liability in rim cases. Accordingly, any potential presumption of disclosure arising from that meeting has been rebutted.

Consistent with the Court's findings of fact, the post-*Webb*/pre-*Baker* calls between Hash and Reynolds fall into three categories: requests to review the *Webb* materials, invitations to speak at ATLA meetings, and solicitations of advice concerning *Workman*. Neither the first nor the second category concerns substantive conversations and therefore neither raises the presumption. Similarly, neither McArthur nor Reynolds shared any substantive discussions with Hash at the ATLA meeting in Atlanta. The phone conversations devoted to *Workman* hit closer to the mark, but Reynolds has testified convincingly that Hash again used those conversations as an opportunity to draw upon Reynolds' independent views and experience.

The facts surrounding R & M's entry into this case as found by the Court comport with R & M's consistent argument that it neither wanted nor needed Hash's thoughts on proving Firestone's liability. Reynolds viewed Hash as a fifth wheel and was willing to sideline him from the start. Given R & M's own expertise and its demonstrated willingness to proceed without Hash, it is not surprising to learn that the R & M attorneys generally limited their discussions with Hash to procedural issues concerning his preparation for trial and did not engage in substantive discussions about the liability phase of the Bakers' case.

This is even more true following Hash's disclosure in April of last year that he had shared his *Workman* fee with Downs. Almost all subsequent discussions between R & M and Hash were limited to the practical details necessary to transfer management of the liability case from Hash to R & M effec-

tively. The consistent and detailed testimony of the several parties privy to these conversations has convinced the Court that they were not, save two exceptions, substantive. Warren's discussion with Hash in June of 1994 concerning certain views of Dr. Hahn will not support a presumption of taint insofar as it clearly pertained to the liability of a third party. That leaves Warren's meeting with Hash at Wake Forest University. While seemingly foolish given the pendency of these proceedings, the candor of both men in discussing the incident convinces the Court that the ensuing conversation, while related to the case, concerned only its factual history.

The Court's findings regarding the various conversations between Hash and R & M once the latter became involved in this case preclude any finding of joint preparation for trial. Although Hash demonstrated a willingness to assist R & M in developing the case, R & M never enlisted his support other than to verify his prior completion of certain stages of trial preparation. Hash did discuss with Warren (at Hash's initiative) the defense against the defendants' June '94 motion for a protective order. The limited focus of that discussion, as reflected in Hash's letter dated June 29, 1994, refutes the suggestion of disclosure.

Since becoming involved in this case, R & M has received two separate shipments of material from Hash, as well as the Wagner's entire case file. These facts, standing alone, might reasonably constitute apparent receipt of confidential information in light of Hash's taint. But Warren's straightforward testimony describing the content of the various files and boxes effectively rebuts the presumption. The Court has reviewed pertinent portions of the Wagner file, as well as the correspondence between the plaintiffs' attorneys, *in camera*, providing Firestone with copies of any documents arguably relevant to its motion. Firestone has not made use of any of these materials to contradict or shed different light on Warren's testimony. Accordingly, the Court must conclude that the exchange of these various documents did not result in the exchange of confidential information.

The Court itself has cautioned against slavish reliance on a standardized test to determine the presence of taint, stressing the importance of careful attention to the peculiar facts presented. Thus, in addition to considering the various categories of contacts between Hash and R & M to see if a fixed presumption of taint akin to that proposed by Taskier and Casper arises, the Court has measured the inferential weight of the collective body of contacts between Hash and the R & M firm. Viewed in light of the particular abilities and demeanor of the attorneys involved, this evaluation does not move the Court from its conclusion that the R & M firm has not been tainted by confidential Firestone information.[15] Hash's near farcical first encounter with Reynolds and McArthur in the streets of Lexington serves as an apt metaphor for his entire professional relationship with their firm. Throughout, Hash has played the often bothersome novice with much to learn and, from R & M's perspective, little to offer.

Assuming *arguendo* that R & M has been tainted by its involvement with Hash, the Court believes quite firmly that disqualification is, in this case, a remedy in complete disproportion to the ethical concerns that have been raised. Canons 4 and 9 of the Code of Professional Responsibility promote Firestone's legitimate expectation of confidentiality and the public's faith in the integrity of the judicial system. As for the latter, the Court doubts very seriously that the average citizen's confidence in this system is stiffened when he learns that a blameless man has been virtually sent back to "Go!" in his four-year-old suit against the major corporation alleged to be responsible for his injury. Firestone's expectation of confidentiality remains the primary concern. But it does not compel a vindication that is completely divorced from the likely consequences of its infringement. The facts strongly suggest that confidential information, if any, wrongly passed to R & M will have no impact on the just resolution of this litigation. Warren's review of Hash's discovery and the various depositions provided the only window

through which such information might reasonably have passed. The press of time, the objective of his review, and his own inexperience all mitigate the probability that Warren discerned a latent Firestone secret or a glimmer of Downs' personal insights within those materials. Moreover, decades of rim litigation involving the same cast of experts and voluminous document production by Firestone reduce the likelihood that any given breach of confidence by Downs contributed ammunition to be used against Firestone that was not already in the public domain. In short, anything possibly gained by R & M is less than the proverbial drop in the bucket of the case against Firestone. As observed by Professor Hodes: "To completely disqualify Reynolds & McArthur at this late stage, merely because of the theoretical possibility that it gained some small advantage by having had access to the material provided by John Hash for a brief period of time, would not only be an overreaction, but would be largely symbolic and would do little to protect the defendant's interests in any event." PX A, p. 18. It would, on the other hand, place the Bakers at an extreme disadvantage.

### The Wagner Firm

■ Neither Jim nor Eric Wagner appears to have engaged knowingly in conduct violative of either the letter or the spirit of the Code. Firestone insists, however, that the Wagner firm has been tainted by Firestone confidences leaked from Downs to Hash and in turn from Hash to the Wagners.

Derivative as it is from the case of actual disclosure against Hash and Downs, the disclosure case against the Wagners is weak. The Court has accepted as true Hash's testimony that he recounted to Jim Wagner Downs' description of the various experts Hash intended to call as witnesses. Wagner had no active interest in the descriptions, and the Court has found that he holds no independent recollection of them. Eric Wagner's attendance at several depositions of Plaintiffs' witnesses adds little to the evidence of actual disclosure. The Court has found that

---

**15.** Because Jim Wagner has made no effort to stay abreast of the liability issues in the Bakers' case, the Court concludes that the contacts between R & M and Wagner did not measurably increase the likelihood of taint.

he learned nothing more than what was said in the depositions themselves—depositions presumably conducted by Firestone attorneys and therefore unlikely sources of disclosure. Thus, while Jim Wagner was at one time exposed to several, isolated Firestone secrets, any resulting taint is more formal than real.

Given the frailty of the taint from actual disclosures, it is appropriate to consider whether the facts support a presumption of additional disclosures. As the Bakers' original attorney, Jim Wagner has participated extensively in the litigation of the case to date. The numerous phone calls and personal meetings he has shared with Hash, a man himself tainted by his relationship with Downs, constitute ample substantive discussions to create a presumption of disclosure. Wagner has not denied that the discussions took place; he simply explained that he and Hash neatly divided responsibility between damages and liability, implying that the opportunity for disclosure never arose. Given the frequency of the contacts between the two men and Wagner's understandable inability to recall and discount each conversation individually, his general denial is barely sufficient to rebut the presumption. Regardless, it is surely insufficient to counter the strong inference of disclosure that flows from the facts as found by the Court. The men must have on occasion discussed each other's side of the case (and therefore liability); otherwise, there would appear to be no point to their conversations. They did communicate and regularly. The weight of the evidence therefore makes it more likely than not that on isolated occasions additional disclosures were made.

A finding of taint frequently calls for the disqualification of the infected attorney. Insofar as Mr. Wagner is concerned, there are factors that weigh against his disqualification. Foremost is the improbability that Firestone's interests in this litigation have or will be in any way compromised by whatever disclosures Wagner received. Because he lacked both the experience and the responsibility to become versed in the liability phase of the Bakers' case, he has not developed or maintained an independent pool of knowl-

edge on the topic. Whatever drops he received from Hash have no doubt long evaporated. Furthermore, given Hash's apparent slippery hold on the merits of the liability case, it is doubtful Wagner was ever privy to more than vagaries about the abilities of certain witnesses, several of whom have been barred from testifying. Under these circumstances, the second factor—that is, the Bakers' interest—assumes greater importance. Wagner has been the Bakers' attorney of choice from the outset, and it is reasonable to assume that he is the attorney with whom they feel most comfortable. Moreover, he is the man most familiar with the damages they claim to have suffered. Had they not objected to his disqualification, they likely would not have opposed Firestone's motion so vigorously.

Were Wagner the Bakers' sole attorney, the Court would be inclined, as would Professor Hodes it seems, to stop short of disqualification. But the R & M firm remains in the case on the Bakers' behalf. What is more, Wagner has already relinquished primary authority for the prosecution of the entire case to Carl Reynolds and his firm. This being true, the Bakers can remain assured that their interests are being advanced by attorneys in whom they and Wagner alike have already placed their trust. On balance, the Court believes it to be in the best interest of all parties to act with caution and to forbid Wagner's further participation in this case.

Thus, the Wagner firm is ordered disqualified from future involvement with the litigation of this case. Wagner is entitled to recover his costs and the agreed share of any fee the Bakers ultimately recover. The work of his firm to date on the damages case, as well as on the California fact witnesses, may be used by R & M, under the conditions to be outlined by the Court in a separate protocol.

## IV

That its conclusion departs in whole or in part from the recommendations of two imminently respected professors of law and ethics has not been lost on the Court and surely has provided reason for pause. The Court has

not reached its decision lightly or without careful study of the particular facts.[16]

For the aforementioned reasons, Firestone's renewed motion to disqualify Plaintiffs' counsel (docket # 176) is granted in part and denied in part. Given the considerable attention that has already been devoted to this issue by the Court and the parties alike, the Court does not anticipate the need to reconsider its ruling.

Accordingly, it is hereby ordered that Attorney John Hash be disqualified as plaintiffs' counsel without right to recover any fee or any costs incurred by him to date.

It is further ordered that Hash shall reimburse the plaintiffs for any additional costs borne by them by reason of these proceedings.

It is further ordered that the plaintiffs shall make no use of Firestone-related work product, including discovery, generated by Hash save those items presently part of the public record. Those materials attributable to Hash that are now in the plaintiffs' possession shall be disposed in the manner described in a separate protocol to be issued by the Court.

It is further ordered that Mr. Maddox and Mr. Blate are excluded from appearing as witnesses in the plaintiffs' case-in-chief.

It is further ordered that Attorney J. Roland Wagner's law firm is disqualified as counsel for the plaintiffs in this case while retaining the right to recover a fee for its efforts and any costs incurred.

It is further ordered that any work product generated by the Wagner firm relating to fact witnesses and damages may be used by counsel for the plaintiffs under the conditions to be outlined in the forthcoming protocol. Those documents of the Wagner firm presently in Plaintiffs' possession shall remain under seal until further notice.

It is further ordered that Plaintiffs shall be required to reimburse Firestone for those reasonable costs the latter shall incur complying with additional, repetitive discovery made necessary solely because of Hash's disqualification.

IT IS SO ORDERED.

---

16. It should be noted that the Court, unlike Professors Rotunda and Hodes, enjoyed the advantage of receiving live testimony and of adjudging the credibility of the witnesses before reaching its decision. Moreover, it must be said that the Court simply found certain facts to be different from those hypothetically presented by the parties to their respective experts.