978 So.2d 1 (2007)
Ex parte Helen Kathryn WHEELER and William Newton Phillips, as trustee under the Doris R.H. Phillips Revocable Living Trust Agreement.
(In re Helen Kathryn Wheeler et al.
v.
Don Siegelman et al.)
No. 1051788.
Supreme Court of Alabama.
May 18, 2007.
As Modified on Denial of Rehearing August 17, 2007.
*2 Eugene P. Stutts and Steve R. Burford of Spain & Gillon, L.L.C., Birmingham, for petitioners.
H.E. Nix, Jr., and Murry S. Whitt of Nix Holtsford Gilliland Higgins & Hitson, P.C., Montgomery, for respondents the Alabama Incentives Financing Authority; Henry C. Mabry III, individually, and the secretary of the Alabama Incentives Financing Authority, in his official capacity as director of finance; and Don Siegelman, individually, and as president of the Alabama Incentives Financing Authority, in his official capacity as governor.
Tyrone C. Means, Christopher K. Whitehead, Ramadanah M. Salaam-Jones, and Camille L. Edwards of Thomas, Means, Gillis & Seay, P.C., Montgomery, for respondents the Montgomery County Commission and William F. Joseph, Jr.
Turner B. Williams, John F. De Buys, Jr., and Scott A. Boykin of Burr & Forman, LLP, Birmingham, for respondents CSX Transportation, Inc., CSX Real Property, Inc., David W. Hemphill, and J. Randall Evans.
Robert E. Poundstone IV of Bradley Arant Rose & White, LLP, Montgomery; and Joseph B. Mays of Bradley Arant Rose & White, LLP, Birmingham, for respondents Hyundai Motor Manufacturing Alabama, LLC, and Hyundai Motor America.
Albert L. Jordan and Jason E. Gammons of Wallace, Jordan, Ratliff & Brandt, L.L.C., Birmingham, for respondent Todd Strange.
Thomas T. Gallion III and Constance C. Walker of Haskell Slaughter Young & Gallion, LLC, Montgomery; and Jesse P. Evans III of Haskell Slaughter Young & Rediker, LLC, Birmingham, for respondents Reuben E. Thornton, Jr., and the Industrial Development Board of the City of Montgomery.

On Application for Rehearing
SEE, Justice.
APPLICATION OVERRULED; OPINION OF MAY 18, 2007, MODIFIED.
COBB, C.J., and WOODALL, SMITH, and PARKER, JJ., concur.
*3 Helen Kathryn Wheeler and William Newton Phillips, as trustee under the Doris R.H. Phillips Revocable Living Trust Agreement ("Phillips"), petition this Court for a writ of mandamus directing the trial court to vacate its order removing Spain & Gillon, LLC, as their counsel in this litigation. Because we hold that Spain & Gillon did not violate Rule 1.10, Ala. R. Prof. Cond., and because we hold that any violation of Rule 8.4 of those rules resulted in minimal harm to the defendants, we grant the petition and issue the writ.

Statement of Facts
During Governor Don Siegelman's term of office, a firm representing Hyundai Motor Company ("Hyundai") contacted the Alabama Development Office ("ADO") and requested information regarding incentives and available locations in Alabama for building a large industrial facility. In response to this inquiry, the City of Montgomery, the Montgomery Industrial Development Board ("the IDB"), the Montgomery County Commission, and the Montgomery Area Chamber of Commerce searched for available sites for such a facility. They ultimately acquired land in Montgomery County for an industrial site, including land belonging to Helen Kathryn Wheeler and Phillips.
Wheeler and Phillips executed an option agreement with the IDB for the sale of 800 acres of land for the project site. The option agreement provided that Wheeler and Phillips would sell their land for a minimum of $4,500 per acre. By the terms of the most-favored-nations clause in the option agreement, Wheeler and Phillips would receive an amount equal to the highest price paid to any other seller whose property was later purchased for the project.[1] The IDB subsequently assigned this option to the City of Montgomery and Montgomery County, which exercised the option and then transferred the property to Hyundai Motor Manufacturing Alabama, LLC, as part of a project agreement for the construction of the Hyundai automobile-manufacturing plant. Just before Hyundai announced its choice of a plant site in the United States, a Hyundai representative telephoned ADO and spoke to Todd Strange, the director of ADO. The representative communicated to Strange that Hyundai wanted to acquire a certain piece of property ("the Shelton property") that would allow a redesign of the railroad spur servicing the project site. Various individuals, whom Strange named the "working group," met at the offices of the Montgomery Chamber of Commerce to discuss the request, and Strange and an executive at CSX Transportation, Inc. ("CSX"), arranged for the acquisition of the Shelton property. Under this arrangement, CSX would purchase the Shelton property for rail access, thereby keeping the Shelton property outside the terms of the option agreement. CSX would pay the owner $8,000 per acre for the Shelton property, and the State would reimburse CSX for the purchase.[2] Strange informed the Hyundai representative that the property could be acquired. Subsequently, Hyundai announced that Montgomery would be the site of its automobile-manufacturing site.
Wheeler, Phillips, and other plaintiffs sued several of the participants in these transactions, including the president of the Montgomery Area Chamber of Commerce, Strange, the IDB, the City of Montgomery, the Alabama Incentives Financing Authority ("AIFA"), former Governor Siegelman,[3] *4 former Finance Director Henry Mabry, CSX, and Hyundai. They alleged fraud, suppression, breach of contract, rescission, and conspiracy arising out of the option to purchase their land. Specifically, they allege that the defendants conspired to purchase the Shelton property at a higher price than was paid for their property and that they did so to avoid complying with the most-favored-nations clause of the option agreement.[4]
A. Lee Miller III served as chief of the legal division of the Department of Finance from January 1987 to September 2003. The Code of Alabama defines this position as follows:
"The chief of the legal division shall confer with and advise the Director of Finance and any and all of the subordinate officers and employees of the Department of Finance on all legal matters pertaining to said department."
§ 41-4-203, Ala.Code 1975. Miller served as chief of the legal division during Governor Siegelman's term of office and while Mabry was finance director. After resigning from the Department of Finance in 2003, Miller became "of counsel" to Jemison, Mendelsohn, & James, P.C. ("the Jemison firm"), which represented Southdale, LLC, a plaintiff in this litigation.
Less than a week before this case was set to go to trial, the defendants moved the trial court to disqualify the Jemison firm from representing Southdale, LLC, in this litigation. The defendants asserted that they had "recently learned through discovery . . . that a member of [the Jemison firm], Lee Miller, . . . appears to have provided legal advice regarding the 93 acre rail yard property . . . [during his employment with the Department of Finance]." The defendants also moved to disqualify the firm of Spain & Gillon, LLC, from representing Wheeler and Phillips. The defendants based their motion
"on the ground [that] Spain & Gillon, L.L.C., and its attorneys are working closely with, and upon information and belief, have received confidential information from, Lee Miller of Jemison, Mendelsohn & James P.C., related to this matter and the 93 acres, which likewise causes these attorneys to have impermissible conflict of interest in this case."
*5 After holding hearings on the motion to disqualify, the trial court granted the motion as to both the Jemison firm and Spain & Gillon. Wheeler and Phillips petition this Court for the writ of mandamus, arguing that the trial court erred in disqualifying Spain & Gillon from representing them in this litigation.

Analysis
Although the Jemison firm's disqualification from this litigation has not been challenged, Wheeler and Phillips petition this Court for the writ of mandamus, arguing that the trial court erred in disqualifying Spain & Gillon. The defendants argue that Spain & Gillon was properly disqualified because its representation of Wheeler and Phillips violated Rules 1.10 and 8.4, Ala. R. Prof. Cond. Rule 1.10 provides for the imputed disqualification of a firm based on a conflict of interest in a case on the part of an attorney associated with the firm. Rule 8.4, in part, prohibits attorneys from knowingly assisting other attorneys in violating, or inducing other attorneys to violate, the Alabama Rules of Professional Conduct. Before determining whether Spain & Gillon violated these rules, we must decide whether the defendants had standing to file their joint motion to disqualify counsel.

I. Standard of Review
In Ex parte Central States Health & Life Co. of Omaha, 594 So.2d 80, 81 (Ala.1992), this Court held that "the correct method for seeking review of a lower court's ruling on a motion to disqualify an attorney . . . is by a petition for writ of mandamus only." A writ of mandamus "`is a drastic and extraordinary writ to be issued only where there is (1) a clear legal right in the petitioner to the order sought; (2) an imperative duty upon the respondent to perform, accompanied by a refusal to do so; (3) the lack of another adequate remedy; and (4) properly invoked jurisdiction of the court.'" Ex parte Terminix Int'l Co., 736 So.2d 1092, 1093-94 (Ala. 1999) (citations omitted). The question before us, therefore, is whether Spain & Gillon has a "clear legal right" to represent Wheeler and Phillips in this litigation.

II. Standing

a. Based on a Conflict of Interest
In their petition for the writ of mandamus, Wheeler and Phillips argue that the defendants lacked standing to bring their motion to disqualify Spain & Gillon. Wheeler and Phillips cite our holding in Ex parte Tiffin, 879 So.2d 1160, 1165 (Ala.2003), in which we stated that "'a stranger to the attorney-client relationship lacks standing to assert a conflict of interest in that relationship.'" (Quoting Jones v. American Employers Ins. Co., 106 Ohio App.3d 636, 641, 666 N.E.2d 1152, 1155 (1995).) They argue that neither of Miller's former clients, the Department of Finance and the State Board of Adjustment, are parties to this litigation. Because the defendants were not Miller's clients, Wheeler and Phillips argue, the defendants lack standing to move the trial court to disqualify Spain & Gillon from representing Wheeler and Phillips.
In Tiffin, we held that minority shareholders could not move to disqualify a corporation's counsel on the basis of a conflict of interest under Rules 1.7 and 1.9, Ala. R. Prof. Cond. Because the case was not a shareholder-derivative suit, the shareholders were not representing the interests of the corporation. Because the corporation, and not the shareholders, was counsel's client, the shareholders lacked standing to challenge the representation based on a conflict of interest.
Similarly, in Lowe v. Graves, 404 So.2d 652, 653 (Ala.1981), we held that "'[t]he principle seems to be fully established that *6 only a party who sustains the relation of a client to an attorney, who undertakes to represent conflicting interests, may be entitled to object to such representation for that reason alone.'" (Quoting Riley v. Bradley, 252 Ala. 282, 287, 41 So.2d 641, 644 (1948).) Furthermore, we have stated:
"To allow an unauthorized surrogate to champion the rights of the former client would allow that surrogate to use the conflict rules for his own purposes where a genuine conflict might not really exist. It would place in the hands of the unauthorized surrogate powerful presumptions which are inappropriate in his hands."
404 So.2d at 653. Therefore, we must first determine whether any of the defendants were Lee Miller's clients during his employment as legal counsel for the Department of Finance.
Other courts have held that a lawyer employed by a state agency represents that agency only and does not have a conflict of interest in cases against the state or another state agency. See Gray v. Rhode Island Dep't of Children, Youth & Families, 937 F.Supp. 153, 158 (D.R.I. 1996) ("The client clearly includes the attorney's own agency. On the other hand, it would not include some other agency under all circumstances, because any two agencies can have compatible or conflicting positions depending on the matter involved.").
The defendants assert standing on various grounds. The AIFA and former Governor Siegelman and former Finance Director Mabry, its president and secretary, respectively, at all times pertinent to this litigation, assert that they were Miller's clients during his employment with the Department of Finance. Therefore, they argue, they have standing to challenge his representation in this case and to impute his alleged conflict to Spain & Gillon. They argue that Miller represented the AIFA and thereby represented then Governor Siegelman in his role as president of the AIFA and then Finance Director Mabry in his role as secretary of AIFA. In his deposition, Miller agreed that "the AIFA utilized the staff" of the Department of Finance, including Miller as general counsel, "on some issues." Furthermore, Mabry testified that Miller "ran" the AIFA. They also argue that Miller was Mabry's "statutorily designated lawyer." Presumably, they are referring to § 41-4-203, Ala.Code 1975, which provides: "The chief of the legal division [of the Department of Finance] shall confer with and advise the Director of Finance . . . on all legal matters pertaining to said department."
Wheeler and Phillips acknowledge that by statute Miller reported to Mabry as the Director of Finance. However, they argue, Mabry was not sued in his capacity as Director of Finance. Instead, he was sued individually and as secretary of the AIFA. Moreover, they argue, Mabry did not consult Miller regarding the Hyundai transaction, but instead sought counsel from attorneys with the law firm of Maynard, Cooper & Gale, P.C. They state: "There is certainly no evidence whatsoever that Mabry or the AIFA ever consulted Miller in any way as to the `ploy' used by the defendants to purchase the Shelton property."
Although we agree with Wheeler and Phillips that Miller did not act as then Finance Director Mabry or then Governor Siegelman's personal attorney during his employment with the Department of Finance, Miller's testimony shows that through his position with the Department of Finance he worked for the AIFA. Miller's statutory duties extended only to the Department of Finance and the State Board of Adjustment, but the AIFA apparently operated largely through the staff of the Department of Finance and through *7 Miller particularly. By using Miller as its general counsel "on some issues," the AIFA established an attorney-client relationship with Miller. Therefore, the AIFA had standing to move to disqualify Miller from representing Southdale, LLC, in its action against the AIFA. In the same way, Miller reported to then Governor Siegelman and then Finance Director Mabry, as president and secretary, respectively, of the AIFA. Because we hold that Miller represented the AIFA and both former Governor Siegelman and former Finance Director Mabry in their capacities with the AIFA, these defendants had standing to move for Spain & Gillon's disqualification from this case on the basis of a conflict of interest.

b. Based on Rule 8.4
CSX argues that it has standing to seek disqualification of Spain & Gillon on the basis of Rule 8.4(a). CSX states that it seeks disqualification not on the basis of a conflict of interest, but because of "counsel's obligation under the Rules to report a violation of Rule 8.4(a) to the Court." Rule 8.3, Ala. R. Prof. Cond., imposes on attorneys a duty to "report" any "unprivileged knowledge of a violation of Rule 8.4 . . . to a tribunal or other authority empowered to investigate or act upon such violation." The defendants assert that Spain & Gillon violated the following provision of Rule 8.4(a): "It is professional misconduct for a lawyer to . . . violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another."
CSX cites Ex parte Lammon, 688 So.2d 836 (Ala.Civ.App.1996), for the proposition that CSX has standing to seek Spain & Gillon's disqualification for violating Rule 8.4, Ala. R. Prof. Cond. In Lammon, an attorney moved for sanctions, including the disqualification of counsel, after opposing counsel violated Rule 4.2, Ala. R. Prof. Cond. The trial court disqualified opposing counsel. The Court of Civil Appeals held that "[a] trial court has the authority and the discretion to disqualify counsel for violating the Rules of Professional Conduct, and a `common sense' approach should be used." 688 So.2d at 838 (citing Roberts v. Hutchins, 572 So.2d 1231, 1234 (Ala.1990)). The Court of Civil Appeals upheld the sanction, stating that "[c]ommon sense supports the trial court's disqualification of an attorney who may have violated the Rules of Professional Conduct, and we find no abuse of the trial court's discretion." 688 So.2d at 838.
Rule 8.3 imposes a duty to report unethical behavior "to a tribunal or other authority" and specifically to report behavior in violation of Rule 8.4. CSX and the remaining defendants therefore have standing to seek the disqualification of Spain & Gillon on the allegation of impropriety under Rule 8.4(a).[5]

III. Conflict of Interest
In their joint motion to disqualify counsel, the defendants argue that Miller's conflict in the present case can be imputed to Spain & Gillon "if confidential information obtained by Miller during his representation of the Defendants AIFA and Mabry was shared with Spain & Gillon, L.L.C." Rule 1.10, Ala. R. Prof. Cond., provides for such imputed disqualification:
"(a) While lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by Rules 1.7, 1.8(c), 1.9, or 2.2.

*8 "(b) When a lawyer becomes associated with a firm, the firm may not knowingly represent a person in the same or a substantially related matter in which that lawyer, or a firm with which the lawyer was associated, had previously represented a client whose interests are materially adverse to that person and about whom the lawyer had acquired information protected by Rules 1.6 and 1.9(b) that is material to the matter."
The comment to Rule 1.10 explains that "[p]aragraph (a) operates only among the lawyers currently associated in a firm." In Ex parte Terminix International, 736 So.2d at 1094, this Court explained: "Nothing in Rule 1.10(a) or in the comment to the rule suggests that attorneys employed by different firms working together in a cocounsel relationship constitute a `firm' within the meaning of 1.10(a)." Paragraph (a) does not govern imputed disqualification between Miller and Spain & Gillon because they are not "associated in a firm" as is required by the rule.
The defendants argue that paragraph (b) applies to this case because, they say, the language in it is looser than the language in paragraph (a); instead of applying to lawyers "associated in a firm," paragraph (b) applies to lawyers "associated with a firm." They argue that Miller, while working with the Jemison firm, was associated with Spain & Gillon, and, therefore, that Spain & Gillon should be disqualified from representing Wheeler and Phillips in this case.
In Terminix, this Court "require[d] proof of actual disclosure of confidential information as a prerequisite to disqualifying counsel" when a lawyer with a conflict was never cocounsel with the subject law firm. 736 So.2d at 1095. The Court explained that, "[i]f a showing of actual disclosure was not required, then disqualification could arguably be based on a `double imputation' theory (imputing information from a firm to a member of that firm and then to a member of another firm acting as cocounsel), a theory that has been heavily criticized by other courts." 736 So.2d at 1095. In this case, Miller never acted as cocounsel with Spain & Gillon; in fact, the Jemison firm was not acting as cocounsel with Spain & Gillon, because the firms represented different clients in the litigation. Although Terminix dealt largely with Rule 1.10(a), the Court held that "requiring proof of actual disclosure of confidential information is consistent with paragraphs (b) and (c) of Rule 1.10." 736 So.2d at 1095. The Court also noted in Terminix that the comment to Rule 1.10 "state[s] that paragraphs (b) and (c) of Rule 1.10 operate to disqualify a firm only when the lawyer involved has actual knowledge of information protected by the Rules of Professional Conduct." 736 So.2d at 1096. Therefore, in order to impute Miller's or the Jemison firm's alleged conflict to Spain & Gillon, the evidence must show an actual exchange of confidential information between Miller and Spain & Gillon or between the Jemison firm and Spain & Gillon.
In their joint motion to disqualify counsel, the defendants pointed to communications between Gene Stutts, an attorney with Spain & Gillon, and Lee Miller, after he had gone to work for the Jemison firm, as evidence of actual disclosure of confidential information. To show that Stutts had communicated with Miller, they relied solely on an e-mail from Miller to Pat Haigler, the custodian of records for the AIFA. The e-mail asks whether the bonds issued by the AIFA to finance the Hyundai project were taxable and states that "Gene Stutts, a lawyer from B[irmingham], has asked me to review some documents relating to the AIFA grant to Hyundai to purchase the CSX rail site." In later e-mails *9 to Haigler, Miller asked for a copy of the project agreement. Miller testified that he did not recall whether Stutts or Mays Jemison, a principal in the Jemison firm, asked him to obtain the project agreement, but he thought that the purpose of obtaining the project agreement was to give it to Stutts. When asked whether he discussed with anyone any of the documents he obtained from Haigler, Miller stated, "No. I would have passed those on to whoever had asked for them when I got them." In another e-mail, Miller asked Haigler whether she knew if the IDB "got any AIFA or 21st Century money to help it fund the land purchases for the Hyundai project." Miller testified that he may have also asked her for a copy of a payment voucher.
Wheeler and Phillips argue that the project agreement, which Miller admitted obtaining for Stutts, is a public document and its disclosure therefore does not amount to an "actual disclosure of confidential information." The defendants do not argue that the project agreement is not a public document. Instead, they cite Ex parte Taylor Coal Co., 401 So.2d 1, 9 (Ala.1981), for the proposition that "all information coming to the attorney from his client, whether it be from public records or not, is confidential." However, the information obtained in Taylor Coal was given to an attorney by an individual who was a client of the attorney's at the time of the disclosure; therefore, the information came to the attorney through the attorney-client relationship and was entitled to the attorney-client privilege. By contrast, Miller sought the project agreement from Haigler after his attorney-client relationship with both the AIFA and the Department of Finance had ended. The information was not obtained as a result of the attorney-client relationship and was not entitled to the privilege. Therefore, the statement in Taylor Coal does not apply in this instance, and the public document does not amount to an "actual disclosure of confidential information" by Miller to Stutts.
In their submission in support of the joint motion to disqualify counsel and in their briefs to this Court, defendants Siegelman, Mabry, and the AIFA also cite a couple of meetings at which both Miller and Stutts were present as evidence of communications between Stutts and Miller. Miller testified that he met with Stutts before the filing of this action. The meeting consisted of a general "discussion about the facts that gave rise to this lawsuit." Miller also testified that, sometime after July 2004, Stutts, Mays Jemison, Miller, and two other attorneys went to lunch and discussed this case. Miller testified that "they were talking about the issues in the case and who might have been involved in it." He said that he mostly listened at this lunch, but he also testified that the other attorneys "probably" asked him about how public corporations like the AIFA raise their money.
In Terminix, this Court quoted from the report of the special master who had previously heard the case. The special master referred to an opinion of the State Bar, which stated "`that any presumption of shared confidence between members of the same firm does not extend to lawyers in a cocounsel relationship.'" 736 So.2d at 1094. Instead, the Bar stated that "`the disqualification of a lawyer or firm would only be appropriate when confidential information has actually been disclosed between cocounsel.'" 736 So.2d at 1094. Although the meetings involving Stutts and Miller could lead one to speculate that confidential information could have been shared between Miller and Spain & Gillon, no such presumption exists; instead, the defendants must show actual disclosure of confidential information in those meetings. The defendants have failed to present evidence *10 of any actual disclosure between Miller and Stutts and thus have failed to meet their burden.

IV. Rule 8.4
The defendants also argue that Spain & Gillon violated Rule 8.4(a), Ala. R. Prof. Cond., by "knowingly assist[ing] or induc[ing]" Miller in violating the Alabama Rules of Professional Conduct. In their submission in support of the joint motion to disqualify counsel, the defendants stated:
"Stutts used Miller to analyze documents received from the Department of Finance and was present in a meeting with Miller that was used to gain information related to several of the Defendants in this case. Stutts, knowing of Lee Miller's role with the Finance Department, had a duty to act in accordance with the Rules of Professional Conduct, just as the Jemison firm. Yet, like the Jemison firm, Stutts chose to ignore his ethical obligations in order to receive the benefit of the use of Lee Miller and his confidential information."
Rule 1.11(a), Ala. R. Prof. Cond., prohibits a former government attorney from "represent[ing] a private client in connection with a matter in which the lawyer participated personally and substantially as a public officer or employee, unless the appropriate government agency consents after consultation." Similarly, Rule 1.11(a) prohibits the firm with which that attorney is associated from representing the private client, unless the disqualified lawyer is screened from participating in the representation and written notice is given to the government agency. The defendants assert, and Wheeler and Phillips do not argue otherwise, that no written notice was given to the AIFA in this case. Also, it appears clear from the record that Miller was not screened from this case, but was instead involved in the investigation of the case. The question, therefore, is whether Miller "participated personally and substantially" in the Hyundai matter while he was employed by the State. Frank McPhillips, an attorney with Maynard, Cooper & Gale who represented the State in the Hyundai transaction, testified that he thought of Miller as his cocounsel regarding the Hyundai matter. Also, Miller approved the funding of the purchase of the Shelton property through the AIFA while he worked for the Department of Finance. There is sufficient evidence, therefore, to show that Miller worked both "personally and substantially" on the Hyundai matter during his employment with the State. Therefore, Rule 1.11 prohibits him from representing a private client in connection with this matter; further, it prohibits the Jemison firm from representing a private client in the matter unless Miller is screened from any participation and written notice is provided to the Department of Finance.
Spain & Gillon knew of Miller's former employment with the State. Miller's e-mail to Haigler says that Gene Stutts, of Spain & Gillon, asked Miller to review documents in relation to the purchase of the Shelton property for use by Hyundai. Furthermore, even though the documents Miller transmitted to Stutts were public documents and therefore not privileged, Miller's "representation" of a private client in this case was prohibited by Rule 1.11. If Stutts did ask Miller to obtain and review documents on behalf of a private client, he may have "induce[d] another" to "violate the Rules of Professional Conduct," which would have been a violation of Rule 8.4(a).

V. Prejudice to the Plaintiffs
Although Stutts may have violated Rule 8.4 by asking Miller to obtain and review documents for Stutts as he prepared for this case, we must also consider the prejudicial effect of the disqualification of Spain & Gillon on Wheeler and Phillips *11 themselves. The defendants cite Baker v. Bridgestone/Firestone, Inc., 893 F.Supp. 1349 (N.D.Ohio 1995), in support of their argument in favor of disqualification based on Rule 8.4.
In Baker, the Ohio court disqualified an attorney and one of two law firms representing the plaintiffs in a products-liability action. The court disqualified one firm because of frequent contacts between it and the disqualified lawyer, stating that "[t]he weight of the evidence therefore makes it more likely than not that on isolated occasions additional disclosures were made." 893 F.Supp. at 1369. However, the court noted that, "[w]ere [the firm] the Bakers' sole attorney, the Court would be inclined . . . to stop short of disqualification," 893 F.Supp. at 1369, because "the disclosure case against the [firm] [wa]s weak" and "any resulting taint [from the possible disclosures] is more formal than real." 893 F.Supp. at 1368-69. The court did stop short of disqualifying the second firm, holding that "[t]he facts strongly suggest that confidential information, if any, wrongly passed to [the second firm] will have no impact on the just resolution of this litigation." 893 F.Supp. at 1368. The court, quoting an expert from an exhibit in the litigation, stated:
"`To completely disqualify [the second firm] at this late stage, merely because of the theoretical possibility that it gained some small advantage by having had access to the material provided by [the disqualified lawyer] for a brief period of time, would not only be an overreaction, but would be largely symbolic and would do little to protect the defendant's interests in any event.'"
893 F.Supp. at 1368.
This Court similarly considers the interests at stake when deciding whether to disqualify counsel:
"`Disqualification of counsel, like other reaches for perfection, is tempered by a need to balance a variety of competing considerations and complex concepts. Disqualification in spasm reaction to every situation capable of appearing improper to the jaundiced cynic is as goal-defeating as failure to disqualify in blind disregard of flagrant conflicts of interest. Between these ethical extremes lie less obvious influences on the interest of society in the orderly administration of justice, on the interest of clients in candid consultation and choice of counsel, and on the interest of the legal profession in its representational soul.'"
Taylor Coal, 401 So.2d at 7 (quoting Arkansas v. Dean Foods Prods. Co., 605 F.2d 380, 383 (8th Cir.1979)).
In this case, the defendants filed their joint motion to disqualify counsel one week before the trial date and more than two years after this litigation had commenced. The parties have taken over 29 depositions, and the plaintiffs have obtained thousands of pages of documents. According to the affidavit of Steve R. Burford, an attorney with Spain & Gillon, the lawyers with Spain & Gillon have spent more than 2,469 hours working on this case. Unlike the disqualified firm in Baker, Spain & Gillon is the only firm representing Wheeler and Phillips. Wheeler and William Newton Phillips, both elderly individuals living outside the State of Alabama, would undoubtedly suffer a great deal of prejudice if Spain & Gillon was disqualified from representing them in this case.
Moreover, the defendants have not shown any actual disclosure of confidential information from Miller to Spain & Gillon. Although Stutts's request for Miller to obtain documents from the State and to review those documents was improper in light of Rule 1.11, Ala. R. Prof. Cond., the resulting harm to the defendants was minimal. Miller testified that he did not analyze the documents or discuss them with *12 Stutts; he says he merely "passed them on." The documents were matters of public record, and Miller's acquiring them did not provide Spain & Gillon with confidential information. To disqualify Spain & Gillon under these circumstances, based on the evidence provided by the defendants, would amount to the "overreaction" the Baker court sought to avoid.[6]

Conclusion
The defendants in this case did not provide evidence of an actual disclosure of confidential information between Miller and Spain & Gillon, as is required by this Court's holding in Terminix. Therefore, no conflict of interest arose under Rule 1.10. Although Gene Stutts arguably "induce[d]" Miller to obtain and review documents from the State in violation of Rule 1.11, the documents he obtained were public records, and any harm to the defendants resulting from Stutts's request appears to be minimal. Balancing this harm against the prejudice to Wheeler and Phillips that would be caused by disqualifying their counsel at this stage in the litigation, we hold that the trial court erred in granting the joint motion to disqualify counsel as to Spain & Gillon. Therefore, we grant the petition and issue the writ of mandamus, directing the trial court to vacate its order insofar as it removed Spain & Gillon as Wheeler and Phillips's counsel in this litigation.
PETITION GRANTED; WRIT ISSUED.
COBB, C.J., and WOODALL, SMITH, and PARKER, JJ., concur.
NOTES
[1] Both Wheeler and Phillips were ultimately paid $4,500 per acre for their properties.
[2] The landowner received over $12,000 per acre for the property.
[3] In his position as Governor, Siegelman served as president of the AIFA. Dr. Henry Mabry, as state finance director during Governor Siegelman's term, served as secretary of the AIFA. See Ala.Code 1975, § 41-10-540 et seq.
[4] In an e-mail sent to David Echols, the ADO project manager, confirming this arrangement, David Hemphill, an assistant vice president of industrial and economic development for CSX, explained the situation as follows:

"Regarding the extra 93 acres that will need to be purchased, you asked if [CSX] would be willing to buy this property for the State and [the City of] Montgomery at approximately $8,000 an acre. . . . The purpose of doing it this way rather than what you did in getting control of the other 1800 acres is to avoid paying the other landowners $8,000 an acre, which would have a negative impact of $10 million on the site cost. . . . Moreover, the other landowners will get wind of this ploy and may create negative community publicity. We have seen this happen before and would prefer not to be in the middle, so if asked, we would respond that the State asked us to buy this additional property and to contact them for further information."
Strange responded by letter, stating:
"As I indicated to you last night, our option agreements have a `most favored nation' clause where we agreed to pay no more for any one parcel than any of the other parcels. . . . We decided the most appropriate course to follow would be to ask CSX to obtain the parcel for rail access to keep it outside of the project agreement."
Both then Governor Siegelman and then Finance Director Mabry received copies of Strange's letter.
[5] Strange argues several other bases for standing to seek the disqualification of Spain & Gillon; however, it is not necessary to address these arguments.
[6] In their petition, Wheeler and Phillips also argue that the defendants waived their right to file the joint motion to disqualify by waiting to file it until days before the trial. However, because we hold in favor of Wheeler and Phillips on the basis of the prejudicial effect to them of disqualifying Spain & Gillon, we do not reach this issue.