MENDHEIM, Justice.
*230 The Utilities Board of the City of Tuskegee ("UBT") petitions this Court for a writ of mandamus directing the Macon Circuit Court to vacate its December 7, 2017, order disqualifying UBT's retained counsel, Huie, Fernambucq & Stewart, LLP ("the Huie firm"), from representing UBT in a case pending before the trial court. We grant the petition and issue the writ.
I. Facts
On May 19, 2017, Jerry Tarver, Sr., sued UBT and numerous other defendants seeking damages based on alleged exposure to contaminated water purportedly caused by the defendants' combined and concurring negligence. More specifically, Tarver alleged that,
"[a]s a result of the negligent, unauthorized, unpermitted, and illegal discharging of waste products and hazardous chemicals and compounds into the Tallapoosa River, the water treatment facilities in Tuskegee and Macon County have been providing polluted water to [Tarver] for drinking, cooking, bathing, and [his] everyday use. Instead of properly treating the water from the Tallapoosa River, the water treatment facilities made the condition of the water worse."
One of the defendants, Advanced Disposal Services, Inc., is the corporate head of several of the other defendants, including the Tallassee Waste Disposal Center, Inc., which owns Stone's Throw Landfill in Tallassee. Tarver alleges that "Stone's Throw Landfill is a major source of pollutants discharged into the Tallapoosa River."
In June 2017, UBT retained the Huie firm and one of its attorneys, De Martenson, to represent UBT in Tarver's action and in several similar actions filed by other plaintiffs who had retained Tarver's counsel. On June 26, 2017, UBT filed its answer to Tarver's complaint, denying all material allegations and asserting certain affirmative defenses. Martenson and other attorneys in the Huie firm -- Jennifer Egbe, Jeremy Gaddy, and H. Lanier Brown II -- filed appearances for UBT as part of that answer.
In August 2017, Tarver's counsel sent Brown an e-mail asserting that Brown's service on the Alabama Environmental Management Commission ("the AEMC") created a conflict of interest regarding Brown's representation of UBT in Tarver's action. Brown has served on the AEMC since 2008, and he has served as its chairman since October 2013. On August 17, 2017, Brown filed a "Motion to Withdraw" as counsel from the action. In the motion, Brown stated that he "ha[d] performed no work on this case." On August 21, 2017, the trial court granted Brown's motion to withdraw.
On September 6, 2017, Brown resigned from the Huie firm and joined another law firm. Despite that fact, in a September 21, 2017, e-mail from Tarver's counsel to Martenson, Tarver asserted that the Huie firm should withdraw from the action because of the alleged conflict of interest created by Brown's participation in the firm's representation of UBT.
On October 5, 2017, UBT filed a "Motion to Determine Issue of Claimed Disqualification" in which it sought a determination as to whether the Huie firm had to withdraw from representing UBT in the action. Along with that motion, UBT submitted an *231 affidavit from Brown in which he stated that his
"participation in the case was minimal at best. My involvement was limited to: (1) online research to determine the name of the attorney representing co-defendant Advanced Disposal (0.50 on June 26, 2017); (2) review of email received from Alafile with orders granting various pro hac vice motions (0.20 on July 17, 2017); and (3) review of email received from Alafile with multiple pleadings and statements filed in response to pro hac vice motions filed by various co-defendants (0.30 on July 26, 2017). I never performed any substantive work on this case."
Brown further averred that the Huie firm "never had any involvement in my service on the [AEMC], nor has [the Huie firm] ever represented either [the Alabama Department of Environmental Management] or the [AEMC]." He added that he had "no recollection of ever participating in, or presiding over, any administrative hearing that involved the Stone's Throw Landfill in Tallassee and/or complaints regarding the City of Tallassee's Waste Disposal Center."
On October 30, 2017, Tarver filed a "Motion to Disqualify" the Huie firm from representing UBT in his action. Tarver based his motion on Rule 1.11(a), Ala. R. Prof. Cond., which places restrictions on when a current or former government attorney may represent a private client. In the motion, Tarver asserted that "[t]he environmental issues in the present case have been argued and contested before Chairman Brown and the AEMC prior to and following the filing of this case."
In support of his motion to disqualify the Huie firm, Tarver submitted a transcript of a public meeting of the AEMC held on October 21, 2016, over which Brown had presided as chairman. Among the citizens to comment in that public meeting were Adam Johnston, who spoke on behalf of "Black Belt Citizens Fighting for Health and Justice," and Ron Smith, who stated that he represented the "Ashurst Bar/Smith Community." In the midst of expressing several concerns about various permits issued by the director of the Alabama Department of Environmental Management ("ADEM"), Johnston stated: "We also feel that the direct permitting of the Stones Throw Landfill in Tallassee has also violated rights of individuals' concerns [sic] and that if the Director would've never permitted that entity, then we wouldn't have these civil rights concerns." Smith complained about the odors permeating from the Stone's Throw Landfill to his house and the surrounding community as well as an alleged reduction in the fish population in the waters near the landfill. Smith further asserted that the AEMC was "taking the path of least resistence" in holding public meetings without taking action.
On November 17, 2017, the trial court heard the parties' arguments on the disqualification issue. On December 7, 2017, the trial court entered an order in which it concluded that "the Huie firm is due to be, and is hereby disqualified from further participation in this case, and all related cases, based upon the Alabama Rules of Professional Conduct, the Code of Alabama and controlling case law." In support of this conclusion, the trial court specifically cited Rule 1.11(a), Ala. R. Prof. Cond., and the minutes of the October 21, 2016, public meeting of the AEMC, which, according to the trial court, recorded comments from "a resident of the Ashurst Bar/Smith community in Macon County" who "addressed the AEMC concerning the community's ongoing problems with the 'Tallassee Waste Disposal Center' and presented a litany of complaints concerning *232 alleged pollution coming from the landfill." The trial court also noted that Tarver had filed as an exhibit "a lawsuit filed and presently pending, on behalf of ADEM against the City of Tallassee, Alabama, for operation of its waste treatment facility which accepts waste from the Tallassee Waste Disposal center which is then treated and discharged into the Tallapoosa River." The trial court further observed:
"In ruling on the disqualification issue, the Court has taken into consideration the fact that the conflict of interest/disqualification issue was raised with the Huie firm very early in this proceeding and that virtually no discovery has been undertaken in the case. The Court notes that Mr. Brown, upon being advised of a potential conflict filed a Motion to Withdraw from this case, and all related cases, almost immediately. The Court finds there is a substantial overlapping of legal and factual issues in this litigation and related issues before ADEM and the AEMC which create a conflict as recognized by H. Lanier Brown which led him to withdraw. The Court also finds that Mr. Brown's conflict directly impacts the Huie firm, notwithstanding his recent departure from the Huie firm.
"The Court also notes that the [UBT] is represented by the Honorable Milton Davis and [Tarver] has stipulated that any disqualification motion does not extend to Mr. Davis nor his firm such that the Board will continue to be represented by counsel if the Huie firm is required to withdraw by disqualification."
Subsequently, UBT filed this petition for a writ of mandamus.
II. Standard of Review
"It is well settled that '[a] petition for a writ of mandamus is the appropriate vehicle by which to review an order disqualifying an attorney from representing a party.' Ex parte Tiffin, 879 So.2d 1160, 1164 (Ala. 2003). See also Ex parte Intergraph Corp., 670 So.2d 858, 860 (Ala. 1995) ; Ex parte Central States Health & Life Co. of Omaha, 594 So.2d 80 (Ala. 1992). 'A writ of mandamus will issue where the petitioner has demonstrated "a clear legal right to the relief sought." ' Ex parte Dowdell, 677 So.2d 1158, 1159 (Ala. 1996) (quoting Ex parte Clark, 643 So.2d 977, 978 (Ala. 1994) )."
Ex parte Regions Bank, 914 So.2d 843, 847 (Ala. 2005). In other words, "[t]he question before us ... is whether [UBT] has a 'clear legal right' to [be] represent[ed by the Huie firm] in this litigation." Ex parte Wheeler, 978 So.2d 1, 5 (Ala. 2007).
III. Analysis
We begin by observing that " '[a] trial court has the authority and the discretion to disqualify counsel for violating the Rules of Professional Conduct, and a "common sense" approach should be used.' " Ex parte Wheeler, 978 So.2d at 7 (quoting Ex parte Lammon, 688 So.2d 836, 838 (Ala. Civ. App. 1996) ). See also Roberts v. Hutchins, 572 So.2d 1231, 1233, 1234 (Ala. 1990) (noting that, "[i]n Ex parte America's First Credit Union, [519 So.2d 1325 (Ala. 1988) ], this Court adopted the 'common sense' approach to questions concerning the vicarious disqualification of lawyers" and that this " 'common sense' approach ... has been carried forward into the new Alabama Rules of Professional Conduct").
As we noted in the rendition of the facts, the trial court's finding that the Huie firm must be disqualified from representing UBT was ultimately based upon Rule 1.11(a), Ala. R. Prof. Cond. In pertinent part, Rule 1.11 provides:
*233 "(a) Except as law may otherwise expressly permit, a lawyer shall not represent a private client in connection with a matter in which the lawyer participated personally and substantially as a public officer or employee, unless the appropriate government agency consents after consultation. No lawyer in a firm with which that lawyer is associated may knowingly undertake or continue representation in such a matter unless:
"(1) the disqualified lawyer is screened from any participation in the matter and is apportioned no part of the fee therefrom; and
"(2) written notice is promptly given to the appropriate government agency to enable it to ascertain compliance with the provisions of this rule.
"....
"(d) As used in this rule, the term 'matter' includes:
"(1) any judicial or other proceeding, application, request for a ruling or other determination, contract, claim, controversy, investigation, charge, accusation, arrest or other particular matter involving a specific party or parties;
"(2) Any other matter covered by the conflict of interest rules of the appropriate government agency.
"...."
The idea of imputed disqualification of the law firm that employs a disqualified attorney stems from " ' "a doctrine of imputed knowledge" which posits that the knowledge of one attorney in a law firm is the knowledge of all attorneys in the firm.' " Matthew Lenhardt, Ethical Screens in the Modern Age, 50 Santa Clara L. Rev. 1345, 1350 (2010) (quoting In re Charlisse C., 45 Cal. 4th 145, 161, 84 Cal.Rptr.3d 597, 194 P.3d 330, 339 (2008), quoting in turn Adams v. Aerojet-Gen. Corp., 86 Cal. App. 4th 1324, 1333, 104 Cal.Rptr.2d 116, 122 (2001) ). Therefore, the propriety of Brown's disqualification must be established before his disqualification can be imputed to the Huie firm. UBT makes several arguments contending that Brown was not disqualified from representing UBT under Rule 1.11(a).
The core of UBT's arguments is the language of Rule 1.11 -- a rule that has received scant attention in our cases. Specifically, UBT contends that Tarver never demonstrated that, as a member of the AEMC, Brown "participated personally and substantially" in a "matter" connected with his representation of UBT in this action.[1] Rule 1.11(a), Ala. R. Prof. Cond. UBT notes that Tarver's only specific support for his argument that Brown, as a member and then chairman of the AEMC, was in any way involved in a matter that touched upon the issues in this action was the minutes of the October 21, 2016, public meeting of the AEMC. However, an examination of the content of that public meeting shows that the citizen complaints Brown heard as chairman of that meeting were, at best, remotely related to this action.
Johnston complained about the fact that ADEM had granted a permit for the Stone's Throw Landfill in the first place. No evidence was presented indicating that the AEMC, or Brown in particular, had anything to do with ADEM's initial consideration or approval of the permit for that landfill.[2] Moreover, as UBT observes, *234 Brown and the rest of the AEMC had no power to do anything related to the landfill's permit at the October 21, 2016, public meeting. The AEMC has authority only to correct an "administrative action" of ADEM -- such as the approval of a permit -- through the administrative-hearing procedure initiated by "any person aggrieved by an administrative action of the department." § 22-22A-7(c), Ala. Code 1975. No evidence was presented indicating that Brown had ever participated in such a hearing concerning the permits approved for the Stone's Throw Landfill. Indeed, Brown testified by affidavit that he had "no recollection of ever participating in, or presiding over, any administrative hearing that involved the Stone's Throw Landfill in Tallassee and/or complaints regarding the City of Tallassee's Waste Disposal Center."
Smith's complaints at the public meeting on October 21, 2016, were even more generic. He complained about the odors that emanated from the Stone's Throw Landfill and intimated that the waters around his community near the landfill were polluted. Again, AEMC was not empowered to do anything about those complaints at the public meeting.
Even if we assumed that the October 21, 2016, public meeting was a "matter" in the sense that it fell within the ambit of the types of actions or items listed in Rule 1.11(d)(1), the citizen complaints highlighted by Tarver did not "involv[e the] specific party" Brown represented -- UBT. In other words, none of the complaints concerned the quality of the drinking water provided to citizens by UBT, which is the basis of Tarver's claims against UBT.
Tarver attempts to skirt this problem by contending that, under Rule 1.11(d)(2), "any action Chairman Brown took on behalf of the AEMC is a 'matter' for the purpose of Ala. R. Prof. Cond. 1.11(a)" because "[i]t is undisputed Brown represented the AEMC in his capacity as an attorney, and that the Ala[bama] R[ules] [of] Prof[essional] Cond[uct] apply to his representation of the AEMC." Tarver's brief, pp. 19-20. But Rule 1.11(d)(2) does not mean that because Brown sat on the AEMC by virtue of his status as an attorney,[3] every action he took as a commissioner constituted a "matter" under Rule 1.11(a) that disqualified him from representing certain clients. Rule 1.11(d)(2) refers to "the conflict of interest rules of the appropriate government agency," meaning that a "matter" as described in conflict-of-interest rules of ADEM or the AEMC would also apply for purposes of Rule 1.11(a). (Emphasis added.) Neither Tarver nor the trial court cited any conflict-of-interest rules of ADEM or the AEMC that Brown allegedly violated by representing UBT.
Even if we ignored the foregoing problems and assumed that the October 21, 2016, public meeting of the AEMC constituted a "matter" for purposes of Rule 1.11(d), that meeting constituted Tarver's only evidence of Brown's connection to a "matter." Under any ordinary definition, that one meeting could not be categorized as "personal[ ] and substantial[ ]" "participat[ion]" in a matter by Brown. At best, Johnston's and Smith's complaints consisted *235 of a few minutes of a one-hour-long meeting of the AEMC. According to § 22-22A-6(f), Ala. Code 1975, the AEMC must "meet regularly, at least once every two months," and "[s]pecial meetings may be called at the discretion of the chairman of the Environmental Management Commission." Brown has been an AEMC commissioner since 2008, yet Tarver was unable to present any other evidence of Brown's participation in a matter connected with this action or even with UBT.
Throughout his brief, Tarver conflates the AEMC and ADEM in a futile effort to paper over the lack of evidence of any substantial involvement by Brown in his capacity as an AEMC commissioner in matters connected with this action. See, e.g., Tarver's brief, pp. 8, 19 ("AEMC, as both developer of environmental regulations and final arbiter of application and enforcement, is so intertwined with ADEM the two cannot be separated."; "Chairman Brown represents the AEMC, and by extension, ADEM."). It is apparent from the statutory framework that created the AEMC, see §§ 22-22A-6 through 22-22A-7, Ala. Code 1975, that the AEMC is a body separate from ADEM that supervises ADEM in certain ways.[4] See, e.g., Alfred F. Smith, Jr., and Ronald W. Farley, Negotiating and Litigating with the Alabama Department of Environmental Management, 61 Ala. Law. 322, 326 (2000) ("ADEM and the [A]EMC are two distinct entities. The [A]EMC is the governing oversight body for ADEM."). Actions taken by ADEM through its director cannot automatically be ascribed to the AEMC, which is most readily apparent from the fact that parties aggrieved by "administrative actions" taken by ADEM can challenge those actions before the AEMC. See § 22-22A-7, Ala. Code 1975. Despite this plain distinction, Tarver repeatedly makes generalized accusations against Brown in relation to ADEM for which he provides no supporting authority. See, e.g., Tarver's brief, pp. 16, 17, 18 ("Chairman Brown's participation in matters connected to this case is wide-ranging, personal, and substantial, and goes far beyond a single public hearing, and beyond his work at the Huie firm"; "[t]he vast public record demonstrates Chairman Brown personally and substantially participates in policy decisions that impact the level of protection [Tarver] and others near the Landfill receive from ADEM"; "[n]ot only has Chairman Brown directly listened to complaints regarding the Landfill, he participates in policy decisions that dictate the extent to which [Tarver] and others suffer impacts of the Landfill, and the level of protection afforded residents by ADEM"). If the public record actually supported these accusations, then it was incumbent upon Tarver to present such evidence to demonstrate Brown's disqualification under Rule 1.11(a). Yet, the transcript of the October 21, 2016, public meeting of the AEMC was Tarver's only submission of supporting evidence. As we have already stated, that evidence was insufficient to establish that Brown, as a commissioner of the AEMC, personally and substantially participated in a matter connected with this action.
Tarver also asserts that Brown, and by extension the Huie firm, must be disqualified because "[l]awyers must avoid even the appearance of impropriety." Tarver's *236 brief, p. 13. However, an "appearance-of-impropriety" test in assessing whether an attorney should be disqualified under the Alabama Rules of Professional Conduct simply is not the law of our state. See UBT's reply brief, pp. 10-11.
"Both the ABA's Model Rules of Professional Conduct and Alabama's Rules of Professional Conduct, however, have since deleted their provisions concerning the appearance of impropriety in favor of the more precise rules governing client confidences, conflicts of interest and other matters. Thus, disqualification of counsel in this district can no longer be grounded on an appearance of impropriety."
Wade v. Nationwide Mut. Fire Ins. Co., 225 F.Supp.2d 1323, 1331 (S.D. Ala. 2002). Indeed, the commentary to Rule 1.10, Ala. R. Prof. Cond., which concerns imputed disqualification when attorneys move from one law firm to another, specifically notes that there are at least two problems with the
"rubric formerly used for dealing with vicarious disqualification[, i.e.,] the appearance of impropriety proscribed in Canon 9 of the ABA former Code of Professional Responsibility. First, the appearance of impropriety can be taken to include any new client-lawyer relationship that might make a former client feel anxious. If that meaning were adopted, disqualification would become little more than a question of subjective judgment by the former client. Second, since 'impropriety' is undefined, the term 'appearance of impropriety' is question-begging. It therefore has to be recognized that the problem of imputed disqualification cannot be properly resolved either by simple analogy to a lawyer practicing alone or by the very general concept of appearance of impropriety."
Comments to Rule 1.10 (as amended effective June 23, 2008), Ala. R. Prof. Cond. Because of these problems, the commentary counsels that "[a] rule based on a functional analysis is more appropriate for determining the question of vicarious disqualification." Id. This Court has expressed similar caution with regard to the disqualification of attorneys:
" ' "Disqualification of counsel, like other reaches for perfection, is tempered by a need to balance a variety of competing considerations and complex concepts. Disqualification in spasm reaction to every situation capable of appearing improper to the jaundiced cynic is as goal-defeating as failure to disqualify in blind disregard of flagrant conflicts of interest. Between these ethical extremes lie less obvious influences on the interest of society in the orderly administration of justice, on the interest of clients in candid consultation and choice of counsel, and on the interest of the legal profession in its representational soul." ' "
Ex parte Wheeler, 978 So.2d at 11 (quoting Ex parte Taylor Coal Co., 401 So.2d 1, 7 (Ala. 1981), quoting in turn Arkansas v. Dean Foods Prods. Co., 605 F.2d 380, 383 (8th Cir. 1979) ).
These thoughts, as well as the fact -- as we observed at the outset of this analysis -- that courts should take a "common-sense approach" to disqualification, are worth bearing in mind when assessing the trial court's imputation of disqualification to the Huie firm. The following are the facts actually presented to the trial court concerning Brown's involvement in this action: (1) Brown served as counsel for UBT for only 52 days; (2) it is undisputed that Brown performed no substantive work in UBT's defense during that short period; (3) Brown resigned from the Huie firm 2 *237 weeks after he withdrew as counsel in this action, leaving the firm a month before the Huie firm filed its motion to determine the disqualification issue and almost 2 months before Tarver filed his motion to disqualify the Huie firm from representing UBT; and (4) Brown testified by affidavit, without substantive contradiction, that the Huie firm "never had any involvement in my service on the [AEMC], nor has [the Huie firm] ever represented either ADEM or the [AEMC]." A common-sense assessment of these facts dictates that, even if Tarver had presented some evidence to support the elements of Rule 1.11(a), Ala. R. Prof. Cond., which he did not, Brown's disqualification should not have been imputed to the Huie firm.
In sum, Tarver did not present evidence indicating that Brown, in his capacity as a commissioner of the AEMC, "personally and substantially" participated in a "matter" connected with his brief representation of UBT in this action. Rule 1.11(a), Ala. R. Prof. Cond. Therefore, Brown was not disqualified under the requirements of Rule 1.11(a), and no disqualification could be imputed to the Huie firm. Furthermore, even if Brown's disqualification could be justified, his minimal participation in defending UBT and his resignation from the Huie firm militate against imputing any potential disqualification of Brown to the Huie firm.
IV. Conclusion
For the foregoing reasons, we conclude that the trial court clearly erred by disqualifying the Huie firm from representing UBT. Therefore, we grant the petition for a writ of mandamus and direct the trial court to withdraw its December 7, 2017, order disqualifying the Huie firm from representing UBT in this action.
PETITION GRANTED; WRIT ISSUED.
Stuart, C.J., and Bolin, Parker, Shaw, Main, Wise, Bryan, and Sellers, JJ., concur.

"The party moving for an attorney's disqualification ... bears the burden of proving the existence of a conflict of interest." Ex parte Tiffin, 879 So.2d 1160, 1164 (Ala. 2003). See also In re BellSouth Corp., 334 F.3d 941, 961 (11th Cir. 2003) ("The party moving to disqualify counsel bears the burden of proving the grounds for disqualification.").

The facts Tarver provides in his brief state, without any citation to authority, that ADEM approved the original permit for the Stone's Throw Landfill in 2001 and that ADEM approved a permit modification to expand the landfill in 2003. See Tarver's brief, pp. 8-9. Even if we assume such facts are accurate, ADEM's permit approvals occurred well before Brown joined the AEMC in 2008.

Section 22-22A-6(b)(3) requires one member of the AEMC to be "an attorney licensed to practice law in the State of Alabama."

Precisely because AEMC and ADEM are separate bodies, the trial court's reference to an action filed by ADEM against the City of Tallassee alleging that the city's wastewater-treatment facility discharges pollutants into the Tallapoosa River is irrelevant to the issue whether Brown was disqualified from representing UBT. There is no evidence indicating that the AEMC, or Brown in particular, had any involvement in ADEM's decision to file that action.